United States Court of Appeals
Fifth Circuit

**F I L E D**

**July 27, 2004**

Charles R. Fulbruge III
Clerk

IN THE UNITED STATES COURT OF APPEALS

FOR THE FIFTH CIRCUIT

———————————————

No. 03-40394

———————————————

NADINE JOHNSON,

                              Plaintiff-Appellant,

        versus

DEEP EAST TEXAS REGIONAL NARCOTICS
TRAFFICKING TASK FORCE; ET AL,

                              Defendants,

NACOGDOCHES COUNTY; KIM COURTNEY,
Task Force Member; RAMIRO MENDIOLA,
Nacogdoches County Sheriff Deputy,

                              Defendants-Appellees.

———————————————

Appeal from the United States District Court
for the Eastern District of Texas

———————————————

Before GARWOOD, JOLLY, and CLEMENT, Circuit Judges.

GARWOOD, Circuit Judge:

     In this damage suit under 42 U.S.C. § 1983 arising out of the
March 9, 2001 search of her home, plaintiff-appellant Nadine
Johnson appeals the grant of summary judgment in favor of
defendants-appellees Nacogdoches County and its deputy sheriffs Kim
Courtney and Ramiro Mendiola.  We affirm.

## Facts and Proceedings Below

On March 9, 2001, the Houston Field Division of the Drug Enforcement Agency (DEA) coordinated a "round up" of drug-related, outstanding state and federal arrest warrants in Nacogdoches County, Texas (and possibly other counties). The agencies participating in this round up included the DEA, the ATF, the United States Marshal's Service, the Texas Department of Public Safety, the City of Nacogdoches Police Department, the Nacogdoches County Sheriff's Department, the Sabine County Sheriff's Office, and the Deep East Texas Narcotics Trafficking Task Force (the Task Force).[1]

In preparation for the round up, defendant-appellee Ramiro Mendiola (Mendiola), a deputy sheriff with the Nacogdoches County Sheriff's Office on assignment to the Task Force, put together "bust out" packages for the persons to be arrested. Each package contained the warrant(or warrants) for that person, a blank consent to search form, the address of the person to be arrested which was taken from the offense report, and a photograph of that person, if

---

[1]The exact nature of the Task Force is not entirely clear from the record. It apparently arises from an interlocal cooperation contract or contracts, under Chapter 791 of the Texas Government Code, between various cities and counties in East Texas, including, among others, Nacogdoches County and the City of Nacogdoches, and various state agencies. Personnel were assigned to it from participating local governments and agencies, it received funding from participating local governments and from the state, and it had some sort of board of directors which included representatives from participating local governments. At an early stage in the litigation, the district court dismissed the Task Force, ruling that it was not a legal entity subject to suit. Neither that ruling nor the basis for it has been addressed by any party to this appeal.

available.  After having prepared the packages, Mendiola turned them over to the DEA to be distributed at the round up meeting on the morning of March 9th.

The approximately eighty-seven officers and agents that were to participate in the round up met at 6:30 a.m. on the morning of March 9th, at a DEA command center site, and were then separated into eight teams and given assignments.  Together, these teams were to execute a total of eighty-six state and federal warrants.  Each team leader was given a bust out package on each suspect assigned to that team, and the leaders were told to refer to these packages for the information to conduct their assignments.  The team leaders waited for instructions from the DEA command center to commence execution of the warrants.  While defendant-appellee Kim Courtney (Courtney), a Nacogdoches County deputy sheriff on assignment to the Task Force, was assigned to one of these teams, Mendiola played no role in the execution of the warrants, nor was he a part of any team.

Team three, led by DEA Agent Fred Marshall (Marshall), was originally comprised of eight members, including Courtney.  This team was assigned to execute twelve arrest warrants on a total of ten people, one of whom was Davin Wayne Howard (Howard).  Howard had two outstanding state felony arrest warrants for the delivery of crack cocaine, each warrant being dated December 11, 2000.  These two warrants were apparently based on grand jury felony

3

indictments for crack cocaine sales on September 19, 2000 and October 26, 2000. The bust out package on Howard indicated that his address was 419 Otis Street, Nacogdoches. In preparing this and all other bust out packages, Mendiola referred to the suspect's offense report in the Nacogdoches County jail records. The offense reports on the October 26 and September 19, 2000 sales by Howard each showed his address as 419 Otis Street (the reports described the offenses as street buys on other streets). Howard had been booked in the County jail on July 10, 2000, and then listed his address as 419 Otis Street. This was apparently the source of the information concerning his address on the October 26 and September 19, 2000 offense reports. 419 Otis Street was the address that Mendiola included in preparing Howard's package.[2] However, unknown

---

[2] The arrest warrants did not themselves state Howard's address. The underlying offenses were sales of crack cocaine by Howard to undercover officers, one on September 19, 2000 and the other on October 26, 2000, each in the City of Nacogdoches. The offense reports on those two sales each reflect Howard's address as 419 Otis Street. No arrest was made at the time of either sale. The report on the September 19 sale reflects that it took place "on the roadway on Orton street"; the report on the October 26 sale reflects that it took place on the corner of Orton and Brown streets. The report on the October 26 sale indicates that Howard's address was obtained from the book-in photograph obtained from the jail records, presumably that from the July 10, 2000 arrest. Courtney and another undercover agent, Vanya, made the October 26 "buy"; Vanya prepared the report, including its reference to Howard's address. The September 19 "buy" was made by undercover agents Shaver and Shugart, with the latter preparing the report. When asked at her deposition where the information as to Howard's address in the report of the September 19 "buy" came from, Courtney said "I would imagine it's from the book-in photograph" – presumably referring to that from the July 10, 2000 arrest – but that it was "possible" that Shugart or

4

to Mendiola, or any other of the individual defendants or any law enforcement officers, Howard had in fact not been living at the Otis Street address since August of 2000.[3] Howard's mother, Mrs. Wade, had been leasing the house for some time until her eviction in August 2000. One of the Team three members, City of Nacogdoches Police Officer Cain, had seen Howard at the 419 Otis Street residence in March 2000. However, completely unknown to the Team three members, on March 9, 2001, plaintiff, sixty-seven year old Nadine Johnson was living there alone, as she had been since August 2000.

The team members themselves played no role in acquiring the information in the packages and had no information suggesting that it was not, or was unlikely to be, correct. At the briefing earlier that morning, there was no discussion of Howard's address. The packages were given to the team leader, Marshall, and he told the team members the addresses they were going to. Courtney had

_____

Shaver "had other independent information." Neither Vanya, Shugart nor Shaver was a member of Team three, and there is no evidence any of them played any part in any of the events of March 9, 2001. Apart from understanding that Team three had proceeded to the address listed for Howard on the bust out package for him furnished to Marshall, there is no evidence that Courtney had any knowledge or information as to Howard's address or that she purported to impart any such information to others.

[3] However, Howard continued to list this as his current address. When he was arrested on March 14, 2001, and booked into jail, he listed 419 Otis Street as his address. There is no evidence that on March 9, 2001, the records of the jail or of the Sheriff's department showed any other address (at any time) for Howard or contained any suggestion that 419 Otis Street was not then his address.

nothing to do with confirming whether Howard was then, or ever had been, at the Otis Street address, and as to decisions related to that she was simply following the instructions of Marshall. The team members were under the direction of DEA agent Marshall as the team leader and they were to follow his commands and the DEA procedures for executing the warrants. Marshall, based on the bust out package, believed that 419 Otis Street was where Howard resided, and so did the other team members.

Team three arrived at the Otis Street location about 9 a.m. in two separate cars. Upon arrival, five of the team members, including Courtney and team leader Marshall, went to the front door, while others went around the back and side of the house.[4] Marshall knocked on the door and announced "police, arrest warrant," "police, come to the door," and "police, open up" repeatedly. Upon hearing some movement in the house but not receiving a response after approximately thirty seconds, Marshall ordered team member Cain, a City of Nacogdoches police officer, to breach the door. Cain did so. Courtney did not knock on the door, or participate in its breaching; nor did she say anything before the door was breached and the officers entered. As Marshall testified in his deposition, the decision to breach the door and enter the house was his alone, and all that the members of the team

_____

[4] Team three members present at 419 Otis Street on March 9 were Marshall, three City of Nacogdoches police officers, Cain, Lightfoot and Crelia, two Texas Alcoholic Beverage Commission officers, and Courtney. The eighth team member was absent.

6

did at the Otis Street premises was pursuant to his directions. The team members then entered the house. While there is some dispute as to what exactly was said and precisely how long the officers waited before forcing entry, Johnson admitted that she saw the officers pull up in front of her house and get out of their cars, heard them coming up on the porch, and heard them "hollering police, open up." She testified that she was heading toward the door when it was breached.

Courtney was the last or next to last officer to enter the house. She was the only female on the team and was wearing a mask over her face to protect her identity, as she was an undercover agent with the Task Force, and did not want to be recognized for fear of destroying her undercover status. Once inside, the team members saw Johnson in the front room of the house. She was told by one or more unidentified team members to get down. When Courtney first saw Johnson she was starting to kneel to get down on the couch. Johnson asked Courtney if she could kneel by the sofa and Courtney told her she could. Johnson stated in her deposition that she asked Courtney "who they were looking for" and Courtney told her "to turn my head back around and lay down before she shot me" and that "the lady that told me to lay my head down, she had her gun in her hand. I know she had hers because I kindly turned to see - to ask her that question, but now as far as you know, it

wasn't no clicking on it, but they had them in their hands."[5]
There is no evidence that Courtney ever pointed her gun at Johnson.
Johnson did testify that when the officers entered they had their
guns drawn, pointed "towards me," but that no officer pointed their
gun specifically or directly at her.[6]

---

[5] Courtney on her deposition denies ever "telling her
[Johnson] to turn around or you would shoot her" or words to that
effect.  Other officers testified they heard no such threat by
Courtney.

[6] Johnson's relevant deposition testimony states (questions
by defense counsel except as otherwise indicated):

"Q. And how many officers were – actually pointed a gun
at you that day?

A. When – when that door fell open they all had *guns
drawn*, you know, just, you know, they told me to get on
the floor.

Q. Do you know which officers actually pointed a gun at
you?

A. Well, *they all had their guns in their hands*.

Q. All right.  As far as pointing 'em at you?

A. *They never did take the guns off of me* until after
they got through searching.

Q. All right.  So you're – you're basically saying all
the officers had their guns on you all the time?

A. I believe they did as far as to be truthfully I
believe they did.  All except the one – now, the one –
I don't know, that was searching I don't know if he had
his *drawn* at the – at the time when he was searching or
not . . . .

Q. All right.  And so you're saying that once you're
even down on the floor they all still had their guns on
you?

8

A. I believe – yes, uh-huh.

Q. Okay.  Except for one that might have gone through the house?

A. The one that might have gone through the house.  See I couldn't see, I couldn't turn around because she told me keep my head down and so that's, you know –

Q. So were you able to see whether they had their guns on you or not?

A. No, I had my head down like that [indicating].

Q. So you couldn't see whether they had their guns –

A. No.

Q.  – on you or not?

A.  – no, but when I was getting on the floor, I know they had 'em *drawn*."

"Q. Okay.  When the officers came into the house, you said that from what you saw the officers had their guns *drawn*?

A.  Yes.

Q. Now, Ms. Johnson, I want to make a distinction between them having their guns drawn and pointing their guns at you, okay?

A.  Uh-huh.  Yes.

Q. Now, let me ask you *did any of the officers point their gun at you*?

A. They – when they – when they broke the door down, *they had the guns in their hands* and they told me to get on the floor –

Q. Yes, ma'am.

A.  – and *they had their guns drawn* in their hands. Uh-huh."

9

. . .

"Q.   – and I'm trying to make a distinction between them having their guns drawn and did – *did any officer ever point their gun at you*?

A.   *Just – no, not, you know, not – not to more than what they already had in their hand when they came in, the guns in their hands.*

Q.   Okay.

**Mr. Stuckey** [plaintiff's counsel]: What direction were the guns pointed?

A.   *Towards me.*

Q.   You said when they came in the house they had their guns *drawn*?

A.   Uh-huh.  Uh-huh.  And they told me to get on the floor, get on the floor.

Q.   Yes, ma'am.  And I'm just trying to figure out from you what you testimony is gonna be.  Did *any of the officers point their guns at you*?

A.   *No more than where they was already pointed when they came in.*  Is that what you're talking about?

Q.   Yes, ma'am.  *Did they have their guns in the air like this like you see on TV*?

A.   *Yes.*  Uh-huh.  *When they came in.*

Q.   And that was how their guns were presented when they came in the house?

A.   Yes.  Uh-huh.

Q.   *And nobody pointed their gun at you*?

A.   *No, not just – no.  No.*"  (emphasis added)

This was Johnson's final testimony on that matter.

10

After conducting a quick sweep of the house and discovering that Howard was not there, most of the team members departed.[7] Courtney and Marshall remained briefly to check on Johnson's condition. Courtney asked Johnson if she was ok and helped her up. Courtney then asked if she was going to be alright and if she needed any help. Johnson said that she was fine and did not need assistance. Courtney also apologized to her. Before leaving, Marshall gave his card to Johnson and told her that they would pay to repair her door, which had been damaged during the breach (and this was done). He also asked Johnson if she needed any medical attention, and she declined. Johnson was not hostilely or forcefully touched by any of the officers. However, after her daughter arrived later that day, Johnson went to the emergency room with chest pains and high blood pressure. She remained in the hospital for three days.

In late December 2001, Johnson filed this suit. She ultimately sought damages under 42 U.S.C. § 1983, *Bivens v. Six Unknown Named Agents*, 91 S.Ct. 1999 (1971), and the Federal Tort

---

[7] At some point, Johnson understood from the officers that they were looking for Howard and she told them she did not know Howard. Although Johnson knew Howard's mother, to whom she was distantly related, and Howard's half brother, she had never met Howard himself.

11

Claims Act, against the Task Force, City of Nacogdoches police officers Cain and Lightfoot, the City of Nacogdoches, Nacogdoches County, Nacogdoches deputy sheriffs Courtney and Mendiola, DEA agent Marshall and the United States, complaining that by the events of March 9, 2001, the defendants violated her rights under the Fourth Amendment to be free from unreasonable search and seizure. Johnson eventually settled with Cain, Lightfoot and the City, as well as with Marshall and the United States, and her claims against those parties were dismissed.[8] As Johnson does not complain on appeal of the dismissal of her claims against the Task Force, this appeal concerns only the dismissal of her claims against Courtney, Mendiola and Nacogdoches County.

Courtney and Mendiola filed separate motions for summary judgment, each contending they were entitled to qualified immunity because they did not violate Johnson's Fourth Amendment rights or, alternatively, if they did, that under the circumstances not all reasonable officers situated as they were would realize that their conduct was constitutionally proscribed. Nacogdoches County filed a motion for summary judgment contending that it was not liable because the summary judgment evidence could not support a finding that either Courtney or Mendiola, the only County personnel alleged to have been involved, violated Johnson's Fourth Amendment rights;

_____

[8] Johnson's settlement with Marshall and the United States was for $55,000; the terms of the settlement with Cain, Lightfoot and the City are not reflected in the record.

12

and, even if the evidence sufficed to show that Johnson's Fourth Amendment rights had been violated, it did not suffice to show that such was a sufficiently direct or proximate result of any policy or custom of Nacogdoches County; and further that, in any event, no such formal policy nor any equivalent custom or practice on the part of the County was either properly alleged or shown by sufficient evidence to be unconstitutional or adopted or continued by county policy makers in deliberate indifference to infringement of constitutional rights.

The district court granted these motions for summary judgment and dismissed Johnson's suit against Courtney, Mendiola and the County, who were then the only remaining defendants. The court held that Courtney and Mendiola were entitled to qualified immunity and that no actionable county policy had been properly pled or evidenced. Johnson has timely appealed.

**Discussion**

*1. Standard of Review*

This court reviews the grant of summary judgement *de novo*, applying the same standards as the district court. *Correa v. Fischer*, 982 F.2d 931, 932 (5th Cir. 1993). Summary judgment is appropriate when there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law. FED. R. CIV. P. 56(c). Facts are material if they might affect the outcome of the lawsuit under the governing law. *Anderson v.*

13

*Liberty Lobby, Inc*., 106 S.Ct. 2505, 2510 (1986). To the extent they exist, genuine factual disputes are to be resolved in favor of the nonmovant. *Little v. Liquid Air Corp*., 37 F.3d 1069, 1075 (5th Cir. 1994). In response to a properly supported motion for summary judgment, the nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim, *see Forsyth v. Barr*, 19 F.3d 1527, 1537 (5th Cir. 1994), and such evidence must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial. *Anderson*, 106 S.Ct. at 2511; *Celotex Corp. v. Catrett*, 106 S.Ct. 2548, 2552-53 (1986); *Burge v. St. Tammany Parish*, 336 F.3d 363, 374 (5th Cir. 2003).

*2. Determining qualified immunity*

When a governmental official with discretionary authority is sued for damages under section 1983 and properly raises the defense of qualified immunity, the plaintiff bears the burden of rebutting that defense. *Salas v. Carpenter*, 980 F.2d 299, 306 (5th Cir. 1992). In ruling on a motion for summary judgment based on qualified immunity, the court first determines whether there is evidence to sustain a finding that the defendant's complained of conduct violated plaintiff's constitutional rights. If not, no further inquiry is needed and the defendant is entitled to qualified immunity. If so, the inquiry proceeds to determine

14

whether there is evidence to sustain a finding that under the existing circumstances it would have been "clear to a reasonable officer that his conduct was unlawful in the situation he confronted." *Saucier v. Katz*, 121 S.Ct. 2151, 2156 (2001). If not, the defendant is entitled to qualified immunity. *See Anderson v. Creighton*, 107 S.Ct. 3034, 3039 ("in the light of pre-existing law the unlawfulness must be apparent"), 3040 ("The relevant question . . . is . . . whether a reasonable officer *could* have believed . . . [his] warrantless search to be lawful, in light of clearly established law and the information the searching officer possessed"; emphasis added) (1987); *Malley v. Briggs*, 106 S.Ct. 1092, 1096 (1986) ("qualified immunity . . . provides ample protection to all but the plainly incompetent or those who knowingly violate the law"; there is no immunity "if *no* reasonably competent officer would have" thought his conduct was lawful, "but if officers of reasonable competence *could* disagree on this issue, immunity should be recognized"; emphasis added).[9]

*3. Mendiola*

---

[9] *See also Wilson v. Lagne*, 119 S.Ct. 1692, 1700 (1999) (". . . the appropriate question is . . . whether a reasonable officer *could* have believed that . . . [his complained of conduct] was lawful, in light of clearly established law and the information the officers possessed") (emphasis added); *McClendon v. City of Columbia*, 305 F.3d 314, 332 (5th Cir. 2002; en banc) ("qualified immunity should be granted if a reasonable official would be left uncertain of the law's application to the facts confronting him") (internal quotation marks and citations omitted).

Johnson argues that Mendiola violated her Fourth Amendment rights because he provided the DEA with the package for Howard which showed his address as 419 Otis Street without a reasonable belief that Howard then in fact lived at or would otherwise be present at that address. She asserts that in *Payton v. New York*, 100 S.Ct. 1371 (1980), the Supreme Court made it clear that an officer executing an arrest warrant at a residence must have a reason to believe that the party named in the warrant resides in the place to be entered and that such party is then present there. *See also United States v. Route*, 104 F.3d 59, 62 (5th Cir. 1997) (officer's authority to enter residence of person named in warrant to execute it is governed by a "reason to believe" standard); *United States v. Bervaldi*, 226 F.3d 1256, 1263 (11 Cir. 2000).[10]

Johnson notes that the only information Mendiola had linking Howard to the Otis Street address was Howard's own admission that it was his current address when he was booked into jail in July of 2000,[11] or, at the most, the offense reports on the September and

_____

[10] In *Bervaldi* the court held that, as a matter of law, police entering a house pursuant to an arrest warrant had a reasonable belief that the subject of the warrant resided there based on information that was more than six months old. *Id.*, 226 F.3d at 1264-66. The court explained that "[t]here is no particular rule or time limit for when information becomes stale" and "[r]esiding in a house . . . generally is not transitory or ephemeral, but instead endures for some length of time." *Id*. at 1265.

[11] There is no evidence to suggest that this was not Howard's actual address at the time he gave the information.

16

October 2000 offenses.  Moreover, Johnson contends that although Mendiola might have verified Howard's address using a number of methods, such as surveillance of 419 Otis Street (or of Howard) or checking with utility companies or neighbors, he did not do so and instead simply examined the jail records.

Johnson presented no evidence that on the morning of March 9, 2001, Mendiola had (or that the jail records contained) any information suggesting that Howard's address was not then 419 Otis Street or that he would likely not then be there.  Mendiola was not charged with making an independent investigation.  He was merely instructed to obtain the subjects' addresses for inclusion in the bust out packages, and it was up to his best judgement as to how to complete the task assigned to him.[12]  Mendiola did not meet with Team three, or any other team, and did not accompany any team in the service of any warrants.  Apart from putting together the bust out packages, and placing thereon the address of the party named in the warrant (which he had merely procured from the jail records),

---

[12] Further, in response to plaintiff's opposition to Mendiola's motion for summary judgment, Mendiola contended that he prepared all, or at least 30, of the bust out packages, and had only a very brief time, one day or less, to do so, and hence could not reasonably or practically be expected to have surveillance conducted or utility records checked or the like. There is no evidence and Johnson has never contended that there was time to perform those tasks between the request for the bust out packages and their delivery the morning of March 9.  Nor is there any evidence of who, other than the DEA, was responsible for when the packages were requested or when the round up was to begin.

17

and delivering the packages to the DEA on the morning of March 9, Mendiola had no discussion with and imparted no information to any of those conducting the round up concerning any of those named in the warrants or the addresses or likely whereabouts of any of them.

Moreover, the statement on the bust out packages of the address of the party named in the arrest warrant may not reasonably be understood as being absolutely current. There would frequently be some lag time before utility records or the like would be changed. Indeed, the party might well be residing at an address for which the utility records were in another's name. That was likely the case with Howard, who had apparently lived with his mother, whose last name was Wade, while she rented the 419 Otis Street premises. There is no evidence whatever that examination of utility or similar records would have suggested that Howard resided at another address or no longer resided at 419 Otis Street.

Further, the bust out packages could not reasonably be understood to represent, even impliedly, that the party named in the arrest warrant would actually be present at the stated address on the morning of March 9. Accordingly, Mendiola, in issuing the bust out packages could reasonably assume that entry into the stated address on the morning of March 9 would be either by consent or on the basis of further information that the party named in the arrest warrant was then actually present there.

Indeed, that is in essence what Mendiola did assume. When

18

asked by Johnson's counsel on his deposition whether he now realized, with the benefit of hindsight, how the events of the morning of March 9 at 419 Otis Street, showed the importance of giving persons who are to serve arrest warrants "the most current information possible," Mendiola responded that in his ten years of service that was the *only* such event,[13] and that the way the DEA did it was not the way "we do our bust outs." On Task Force bust outs the normal procedure was "to give the warrants to the participating agencies and they arrest the individuals as they see them. We don't go kick in the door;" if the officer knows the person for whom the warrant is issued and knows that they are there, the officer may go to the person's house. Being familiar with longstanding Nacogdoches policy and practice, Mendiola knew Nacogdoches County would not have executed the warrant for Howard's arrest the way it was done March 9, and "we don't kick in a door for that." There was no contrary evidence.[14]

While Mendiola could expect that the officers would go to the 419 Otis Street address, it was not unreasonable for him *not* to

---

[13] Nor is there any evidence that any of the other warrants served in the March 9 round up involved entry into a residence where the party to be arrested was not then present or involved a package where the address listed was other than the then address of the arrestee.

[14] Similarly, Courtney testified on her deposition that her standard procedure before attempting to enter the 419 Otis Street premises would have been to check further (such as with neighbors) to determine whether Howard was there. There was no contrary evidence.

19

expect that without further information that Howard was then present – such as knocking and asking if he was present or the like – that the officer would enter without consent. There is no evidence to the contrary. Indeed, the bust out packages contained a consent to search form, and the DEA operation plan for the round up specifically advised that "Team leaders should attempt to attain a signed Consent to Search form from every residence involved. If no Consent to Search can be obtained, please contact the command center or AUSA Malcolm [last name redacted] for further instruction."

There is no summary judgment evidence sufficient to support a finding that any action or inaction on the part of Mendiola was proscribed by the Fourth Amendment or constituted or amounted to an invasion of Johnson's Fourth Amendment rights. The district court accordingly did not err in granting Mendiola's motion for summary judgment that he was entitled to qualified immunity.

*4. Courtney*

Johnson sued Courtney in her individual capacity, claiming that she and the other team members unlawfully entered her house and conducted the entry and search in a constitutionally unreasonable manner.

(a) Johnson's primary focus is on the nature of the officer's entry into her house and particularly the asserted violation of the knock and announce component of the Fourth Amendment. Given *United*

20

*States v. Banks*, 124 S.Ct. 571 (2003), it is clearly arguable that there was no such violation. We need not, and do not, ultimately determine that matter, however. It is undisputed that Courtney had no part in the decision to make the entry in question. She did not knock or demand entry, she did not participate in forcing the door, and she did not counsel or direct such action. DEA agent Marshall, the team leader, made all those decisions entirely on his own; Marshall alone knocked and demanded entry; he alone directed City police officer Cain to breach the door, and Cain did so. It is undisputed that the members of Team three were under the direction of team leader DEA agent Marshall and "were to follow his instructions and the DEA procedures for executing the warrants." There was no constitutional violation committed by Courtney in this connection. Accordingly, the district court did not err in granting Courtney's motion for summary judgment as to this claim.

(b) With respect to Courtney's subsequent entry into the house, this, as noted, was entirely at the direction of Marshall, the team leader. His uncontradicted testimony is that, so far as he was aware, none of the officers did anything at the scene that he did not tell them to do. Courtney was the last or next to last to enter. She was aware that the bust out package information furnished Marshall showed Howard's residence as 419 Otis Street. She had no information indicating that likely was not correct or that Howard likely was not there. The district court, correctly

21

noting our holding in *Doe v. Dallas Independent School District*, 153 F.3d 211, 219 (5th Cir. 1998), that "[a]ctions and decisions by officials that are merely inept, erroneous, ineffective, or negligent do not amount to deliberate indifference and thus do not divest the official of qualified immunity,"[15] held that Courtney (as well as Mendiola) was entitled to qualified immunity. Given that "[t]here is no particular rule or time limit for when information becomes stale" for these purposes and that "residency in a house . . . generally is not transitory or ephemeral but instead endures for some length of time," *Bervaldi,* 226 F.3d at 1265,[16] we hold that the district court did not err in determining that, under all the circumstances, Courtney was entitled to qualified immunity with respect to her entry into the house under Marshall's direction after Marshall had knocked, announced and demanded entry, after Cain had breached the door at Marshall's direction, and after Marshall and others had entered, because not all reasonable officers, with the information Courtney then had, would have

---

[15] And our similar holding in *Wren v. Towe*, 130 F.3d 1154, 1159 (5th Cir. 1997), that "[i]f reasonable public officials could differ on the legality of a defendant's actions, the defendant is entitled to immunity from suit" and "[l]aw enforcement officers are only human, and inevitably, accidents and mistakes of judgment will happen, and these mistakes alone do not open officers to personal liability."

[16] We are aware of no cases in this Circuit contrary to these observations in *Bervaldi*. *See also U.S. v. Hooshmand*, 931 F.3d 725, 735-37 (11th Cir. 1991) (11 month old report by informant supports warrant).

concluded that her entry was illegal. *Cf. Saucier*, 121 S.Ct. at 2159 ("what the officer reasonably understood his powers and responsibilities to be, when he acted").

(c) Johnson also complains of excessive force being used by the officers after their entry into the house.[17] The reasonableness of a particular use of force "must be judged from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight . . . . The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments . . . about the amount of force that is necessary in a particular situation." *Graham v. Connor*, 109 S.Ct. 1865, 1872 (1989). After the officers entered, one or more unidentified officers told Johnson to get down. When Courtney first saw her, Johnson was starting to kneel to get down on the sofa. Johnson asked Courtney if she could kneel by the sofa, and Courtney said she could. Shortly thereafter Johnson, while kneeling on the couch, started to turn her head and Courtney allegedly told her "to turn my head back around and lay down before she shot me."[18] The officers had their guns drawn but none ever

---

[17] To establish a claim for excessive force in violation of the Fourth Amendment, a plaintiff must prove "(1) an injury (2) which resulted directly and only from the use of force that was clearly excessive to the need and (3) the force used was objectively unreasonable." *Williams v. Bramer*, 180 F.3d 699, 703 (5th Cir. 1999).

[18] We assume this happened, though it was denied by Courtney, and the other officers present heard no such thing.

23

pointed their weapons directly or specifically at her. By her own admission, Johnson was never hostilely or forcefully touched by Courtney or any of the officers. Once the officers became aware that Howard was not present they treated her with respect and concern; Courtney helped her up and asked her if she was alright, Courtney and Marshall apologized to her, Marshall said her door would be paid for, left his card, and asked if she was alright or needed medical assistance, and Johnson advised that she was alright and did not need assistance. The evidence does not suffice to support a finding that Courtney used constitutionally excessive force against Johnson. *See, e.g., Hinojosa v. City of Terrell*, 834 F.2d 1223, 1230-32 (5th Cir. 1988). Accordingly, the district court did not err in granting Courtney's motion for summary judgment as to this claim.

*5. Nacogdoches County*

Johnson complains on appeal of the district court's grant of summary judgment in favor of Nacogdoches County on her claim based on the County's alleged policy or practice of not requiring – as opposed to leaving to discretion in individual instances – the updating (by means such as utility records, surveillance or the like) of the information in the Sheriff's Office files concerning the address of a party for whom an arrest warrant had been issued before furnishing that address information to an officer who was to execute the warrant. Johnson also complains in passing of the

24

district court's grant of summary judgment in favor of the County on her claim that the County failed to adequately train Mendiola that he was required to do such updating.

(a) Johnson's primary argument on appeal in support of these contentions is that since May 2002 the district court had limited discovery to qualified immunity issues and events surrounding the entry into Johnson's house and as a consequence "it is fundamentally unfair to deny Plaintiff Johnson the opportunity to prove her allegations concerning the existence of a deficient actual policy."

The County responds to this by asserting that Johnson has waived her discovery complaint. The County observes that after Johnson filed her second amended complaint (her final pleading), the County and the other defendants on November 8, 2002, filed a motion to suspend the pretrial deadlines, noting, among other things, that "Defendant County of Nacogdoches anticipates filing a motion for summary judgment as well, which will likely lead to discovery by the Plaintiff." At that time, the district court's June 24, 2002 scheduling order provided that November 21, 2002 was the deadline for filing dispositive motions and December 1, 2002 was the discovery deadline; final pretrial conference was set for January 6, 2003 and jury selection for January 7, 2003. On November 18, Johnson filed her opposition to the motion to suspend the deadlines, asserting that she "is prepared to comply with all

25

of the deadlines and opposes any delay in the trial." The record does not reflect any ruling on the motion to suspend the pretrial deadlines.

On November 21, 2002, the County filed its motion for summary judgment. On December 2, 2002, Johnson filed her response to the County's motion. The response initially notes the May 2002 limitation on discovery and asserts that "the motion is premature and without merit." The body of the response argues at length the merits of the motion, asserting that Mendiola's disposition reflects that his actions in respect to furnishing Howard's address in the bust out package was consistent with longstanding County policy, that he was not disciplined for furnishing the 419 Otis Street address, and that he was not required, and hence was not trained, to update the address before furnishing it. The response also argues that "a municipality is equally responsible whether an action is taken repeatedly or only once after a deficient policy is established."[19] The response does not request a postponement of ruling on the County's motion, and the only prayer for relief is that the County's motion "be in all things denied." The County's December 9, 2002 reply to Johnson's response, among other things, replies to Johnson's brief comments about lack of discovery by

_____

[19] The response states in a footnote that "Johnson has not been allowed to do any discovery concerning the number of victims." The record does not reflect any attempt to make any such discovery.

26

calling the district court's attention to the above referenced portions of the County's motion to suspend the pretrial deadlines and Johnson's opposition to it. In the meantime, all parties had on December 6, 2002, filed their joint proposed pretrial order, listing contested issues of fact and law, including all those applicable to the claims against and defenses of the County, stating that trial would probably last two days plus jury selection, and listing outstanding pending motions, including the County's motion for summary judgment (as well as the summary judgment motions of all the other defendants) and the motion to suspend pretrial deadlines, but not including any motion to postpone ruling on or to continue the County's motion for summary judgment (or the trial itself) nor any motion under Fed. R. Civ. P. 56(f) or for any discovery. On December 17, the district court, *sua sponte*, continued the previous January 6 and 7, 2003 settings for final pretrial conference and jury selection, and set the motions of the individual defendants for summary judgment on qualified immunity for oral argument on January 6, 2003, and on that date those particular motions were heard and were taken under advisement.[20] On January 15, 2003, the court ordered mediation before the Magistrate Judge who on January 21 reported that Johnson had settled with Cain, Lightfoot and the City, but that mediation

---

[20] At the January 6, 2003 hearing it was announced that Johnson had settled with Marshall and the United States.

27

had reached impasse between Johnson, Courtney, Mendiola and the County. Nothing further transpired until on March 4, 2003, Johnson filed her supplemental response to the motions for summary judgment of the County, Courtney, and Mendiola, in which Johnson merely addressed the Supreme Court's grant of certiorari in *United States v. Banks*, *supra*.

Nothing further transpired until on March 13, 2003, the district court filed its memorandum opinion holding that Courtney, Mendiola and the County were entitled to summary judgment. With respect to the County, the district court ruled, *inter alia*: that "the facts alleged in the Second Amended Complaint do not tend to show that the County . . . policymakers adopted or continued any such policy [as alleged] in deliberate indifference to the constitutional rights of its inhabitants" in as much as Johnson "relies solely on this incident" and "pleads no other facts or circumstances;" that essentially the same deficiencies were present in Johnson's failure to train allegations; that "DEA agent Marshall supervised the March 9, 2002, raid. Any mistakes that day fail to rise above the ordinary negligence of individual officers and cannot be attributed to their government employers;" and, that the County "meets its burden of establishing that the record, taken as a whole, indicates that there is no genuine issue as to any material fact regarding Johnson's § 1983 claims against it."

Considering the record as a whole, we reject Johnson's

28

complaint on appeal concerning lack of discovery as to the County's motion for summary judgment. To begin with, when in November 2002 the defendants moved to suspend the pretrial deadlines, noting that the County was going to file a motion for summary judgment "which will likely lead to discovery by plaintiff," Johnson opposed the motion stating she was then "prepared to comply with all the deadlines and opposes any delay in the trial." At that time, the discovery deadline was set to expire in about two weeks and trial was set to begin in some seven weeks. Within some three weeks, the parties (after the timely filing of the County's summary judgment motion) filed their joint pretrial order, plainly in contemplation of the January 7, 2003 trial date. No party ever filed a motion to continue the trial date. Although Johnson's response to the County's summary judgment motion stated the motion was premature, the response addressed the motion on its merits, did not request any sort of postponement of ruling and prayed only that the motion be "in all things denied." Johnson did not respond to the County's reply which had noted Johnson's statements in her above referenced opposition to the motion to suspend deadlines. Although Johnson later filed a supplemental response to the County's summary judgment motion, this response says nothing about prematurity and did not request any sort of postponement of ruling. Moreover, Johnson never filed any motion to lift any restrictions on discovery or to extend the discovery deadlines, which expired

December 1, 2002, nor did she ever file any discovery request which was denied, nor did she ever file any motion or affidavit under Fed. R. Civ. P. 56(f). And Johnson did not otherwise inform the court how additional discovery would likely create a genuine issue of material fact. Indeed, her second amended complaint, her final pleading, does not allege, even generally or on information and belief, that the County's asserted policy of not requiring updating of Sheriff's Office address records (such as by surveillance or checking with neighbors or utility records) before furnishing that address information to officers who were going to serve an arrest warrant, ever resulted in any other similar incident where the officers serving the warrant made a nonconsensual entry into a house where the person named in the warrant did not reside. Finally, Johnson *did* conduct discovery on County policy and its effects, including, but not limited to, Mendiola's deposition, and the record reflects no instance where any specific discovery sought by Johnson was denied.

Under all these circumstances, Johnson has not shown that the district court abused its discretion in proceeding to rule in mid March 2003 on the County's motion for summary judgment notwithstanding its May 2002 order limiting discovery. *See Stearns Airport Equipment Co. Inc. v. FMC Corp.*, 170 F.3d 518, 535 (5th Cir. 1999) (a "Rule 56(f) motion must demonstrate . . . how the additional discovery will likely create a genuine issue of material

30

fact" and a district court does not abuse its discretion in denying such a motion where "it lacked specificity in identifying the needed discovery"); *Krim v. Banc Texas Group, Inc.*, 989 F.2d 1435, 1442 (5th Cir. 1993) (to postpone summary judgment ruling to obtain further discovery a party must indicate to the court "why he needs additional discovery and *how* the additional discovery will create a genuine issue of material fact"). *See also United States v. Bloom*, 112 F.3d 200, 205 n.17 (5th Cir. 1997); *Porter v. Delta Air Lines Inc.*, 98 F.3d 881, 887 (5th Cir. 1996); *Washington v. Allstate Ins. Co.*, 901 F.2d 1281, 1285 (5th Cir. 1990).

(b) It is clear that a municipality may not be held liable under section 1983 on the basis of *respondeat superior*. *Monell v. Department of Social Services*, 98 S.Ct. 2018 (1978). A municipality's liability under section 1983 requires, among other things, either the unconstitutional action of municipal policymakers or a municipal policy. Hence the only County officials or employees whose conduct is complained of are Mendiola and Courtney, each of whom was only a deputy sheriff and hence was not a policymaker. *Turner v. Upton County, Texas*, 915 F.2d 133, 136 (5th Cir. 1990). Municipal policy for purposes of section 1983 liability may consist of

> "1. A policy statement, ordinance, regulation, or decision that is officially adopted and promulgated by the municipality's lawmaking officers or by an official to whom the lawmakers have delegated policy-making authority; or

31

> 2.  A persistent, widespread practice of city officials or employees, which, although not authorized by officially adopted and promulgated policy, is so common and well settled as to constitute a custom that fairly represents municipal policy.  Actual or constructive knowledge of such custom must be attributable to the governing body of the municipality or to an official to whom that body had delegated policy-making authority."

*Johnson v. Moore*, 958 F.2d 92, 94 (5th Cir. 1992).

Johnson has not alleged (nor is there any evidence of) a formal or official policy of the first kind above described.  We assume, arguendo only, that she has sufficiently alleged and shown a policy of the second kind, a longstanding custom and practice of not uniformly requiring (but instead leaving to discretion in individual instances) sheriff's department personnel to update (by means such as surveillance or checking with neighbors or utility companies or the like) the most recent address for an individual reflected in the jail (or Sheriff's Office) records before furnishing that address to officers who were going to execute an arrest warrant for the individual.

For a municipality to be liable on account of its policy, the plaintiff must show, among other things, either (1) that the policy *itself* violated federal law or authorized or directed the deprivation of federal rights or (2) that the policy was adopted or maintained by the municipality's policymakers "with 'deliberate indifference' as to its known or obvious consequences . . . A showing of simple or even heightened negligence will not suffice." *Board of County Comm'rs of Buyan County v. Brown*, 117 S.Ct. 1382,

32

1390 (1997). *See also, e.g., City of Canton, Ohio v. Harris*, 109 S.Ct. 1197, 1206 (1989) (municipal liability requires "deliberate indifference to the constitutional rights of its [the City's] inhabitants"); *Burge v. St. Tammany Parish*, 336 F.3d 363, 370 (5th Cir. 2003); *Piotrowski v. City of Houston*, 237 F.3d 567, 579 (5th Cir. 2001). Here, the only federal right allegedly infringed as a result of the alleged policy is the right to be free of unlawful entry into one's home. As reflected in our above discussion concerning Mendiola, the alleged policy does not facially violate that right and does not purport to either authorize or direct any entry into a home or residence. Hence, Johnson must show that the policy was adopted or maintained with deliberate indifference to the known or obvious fact that such constitutional violations would result. That "generally requires that a plaintiff demonstrate at least a pattern of similar violations." *Burge*, 336 F.3d at 370 (internal quotations omitted); *Cozzo v. Tangipahoa Parish Council*, 279 F.3d 273, 286-88 (5th Cir. 2002); *McClendon v. City of Columbia*, 258 F.3d 432, 441-43 (5th Cir. 2001), rev'd en banc in other respects, this portion of opinion reinstated, 305 F.3d 314, 321 n.3 (5th Cir. 2002); *Thompson v. Upshur County*, 245 F.3d 447, 449 (5th Cir. 2001); *Snyder v. Trepagnier*, 142 F.3d 791, 798-99 (5th Cir. 1998); *Tomkins v. Belt*, 828 F.2d 298, 304-05 (5th Cir. 1987). Here Johnson did not plead that there had ever been any similar incidents (or allege any other facts suggesting that the

33

alleged policy was adopted or maintained with deliberate indifference to constitutional rights), and the evidence, as discussed in part 3 above in connection with Mendiola, shows without contradiction that no similar incident had occurred in Mendiola's some ten years on the job and that officers with arrest warrants to execute generally did so when they saw the named party and would go to a residence to do so only if they knew the party named in the arrest warrant and knew he was there, and did not "kick in doors." There is no contrary evidence. Johnson relies solely on this single incident. The claim against the County hence fails for a lack of any showing of deliberate indifference.[21]

(c) Finally, and in all events, Johnson's claims against the County were properly dismissed because even if Johnson's constitutional rights were violated, it is clear that no complained of County policy or failure to train was the "moving force" behind that alleged violation. As we said in *Fraire v. City of Arlington*, 957 F.2d 1268, 1281 (5th Cir. 1992):

> "[A] *direct* causal connection must exist between the policy and the alleged constitutional deprivation. This connection *must be more than a mere 'but for' coupling* between cause and effect. To form the basis of liability under § 1983, a municipal policy must be affirmatively linked to the constitutional violation and be the *moving force* behind it." (footnotes omitted; emphasis added).

---

[21] For the same reason, Johnson's only other complaint on appeal respecting the County, namely failure to train Mendiola to always update (from outside sources) address information in the sheriff's records before furnishing it to officers who would execute warrants, likewise fails.

*See also City of Canton*, 109 S.Ct. at 1206 ("must be closely related to the ultimate injury" and have "actually caused" the constitutional violation complained of); *Piotrowski*, 237 F.3d at 581; *Pineda v. City of Houston*, 291 F.3d 325, 334 (5th Cir. 2002). What happened at 419 Otis Street starting at about 9 a.m. on March 9, 2001, was entirely determined by DEA agent Marshall, who was in charge and whose directions all officers present were required to and did follow. The warrants were to be served according to DEA procedures. Marshall had not been informed that Howard was, or was likely, then present at 419 Otis Street. If Marshall had simply waited some twenty or thirty seconds more until Johnson arrived at the door, she would doubtless have informed him that Howard did not live there and was not then present, and likely would have allowed the officers to enter to verify that.[22] Marshall's decision to force entry, rather than seek entry by consent, and to do so without further information, was entirely his own decision. There is no evidence suggesting that Marshall made that decision for any reason related to any County policy or any understanding thereof

---

[22] And, if she did not allow entry, the house could have been placed under surveillance by some of the team members (and/or by other officers summoned) and the rest could have continued to serve other warrants. And, Marshall did not seek to attain a consent to search form or seek advice from the Assistant United States Attorney or the DEA command center as the DEA operational plan called for if such consent could not be obtained.

which he may have had,[23] or for any reason other than that he thought that decision to be appropriate in the light of his *own* training and experience as a DEA agent and *DEA* policy and procedures.  Indeed the uncontradicted evidenced is that Marshall's decision in this respect was contrary to County policy and practice.   If there was causative fault on the part of the authorities, the fault was Marshall's and/or the DEA's, not the County's.  *Cf. Rheuark v. Shaw*, 628 F.2d 297, 305-06 (5th Cir. 1980) (county's curtailing budget for court reporters not "proximate cause" of unconstitutional delay in preparation of statement of facts where "[t]he party primarily at fault" was the district judge).

## Conclusion

For the foregoing reasons, the judgment of the district court is

AFFIRMED.

---

[23] There is no evidence Marshall had any information concerning any County policy.