E. GRADY JOLLY, Circuit Judge:
This case, brought as a § 1983 action, presents the question whether the City of Fort Worth incurs municipal liability under Monell v. Dep’t of Social Servs. for the alleged excessive force of two of its police officers. See 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978). Kevin Peterson, who has alleged that he was seriously injured by Fort Worth police officers during the course of an arrest, has not sued the officers individually. Instead, he filed this action against the City of Fort Worth, alleging that officers violated his Fourth Amendment rights by unlawfully detaining him and using excessive force to restrain him. The City counters that the detention and force were reasonable under the Fourth Amendment, and that, in any event, it is not liable because Peterson cannot show that a policy, practice, or custom of the City was the moving force behind the violation. The district court granted summary judgment for the City, finding neither a violation nor municipal liability. We agree that the evidence does not support a claim of unlawful detention, but conclude there is sufficient evidence to establish excessive force. In short, if Peterson had sued the officers, he would have had a colorable claim. Nonetheless, he chose not to do so and because the evidence will not support municipal liability for the individual misconduct of the officers, summary judgment was proper and we affirm.
I.
We begin with a brief summary of the facts, stating them most favorably to Peterson.
*843 On the night of August 14, 2005, Peterson and his wife Jodi joined some friends for a birthday party at Riscky’s Bar-B-Que in Fort Worth’s historic “Stockyards” district. They parked their extended-cab pick-up truck in a parking lot near an establishment called Billy Bob’s Texas, the self-proclaimed world’s largest honky-tonk. They had dinner at Riscky’s Bar-B-Que and at about 10:00 p.m. walked over to a dance club, The Cantina Cadillac. There Peterson had six to eight beers; Jodi had three or four. They stayed until the club closed at 2:00 a.m. Because they were intoxicated, they decided not to drive home but to instead sleep in their truck. Peterson crawled into the back, and Jodi crawled into the front.
A Stockyards security guard later observed two persons sleeping in a truck near Billy Bob’s Texas and called the Fort Worth Police Department. Officers Samantha Horner and Roger Ballard arrived at the scene at about 5:00 a.m. and there they found the Petersons sleeping.
Officer Horner tried to wake Peterson up. According to Officer Horner, she opened the unlocked rear door and shook Peterson’s leg, but he did not respond. She then tapped her baton on Peterson’s sternum; he kicked at her and told her to leave him alone. He began to doze, and she reached into the cab. He swatted at her, and she told him that she was a police officer and that he needed to get out of the truck. When he began to doze again, she grabbed his arm. Peterson then hit her on the forearm. Officer Horner alerted Officer Ballard that Peterson had hit her, and asked for his assistance in getting Peterson out of the truck.
Peterson testified that at this point he woke up. He recalled:
The first thing I remember upon waking up was I was being drug out of the truck by my clothes. I was laying on my back. I actually hit the ground. The door was opened, and they drug me out. I was sliding on my back on the ground; and I had two police officers on me wrestling me to the ground .... And then they rolled me over and put my hands behind my back and put cuffs on me.
Peterson stated that after he was handcuffed the officers pulled him up by the cuffs’ chain:
They just jerked me up off the ground and ... spun me around [and] slammed me up against the bed of the truck .... [T]here wasn’t any struggle with me
And then I noticed hey, these are cops .... I didn’t say anything at that point.
According to Peterson, Officer Ballard was cursing at him when he delivered a hard knee strike to Peterson’s thigh:
The male officer was screaming in my ear. He was on my left, and he was saying you motherfucker. And he reared back and kneed me in the thigh with his knee .... [W]hen he did it, I cringed. I go ugh, ... and I was ... immediately enraged because it was totally unnecessary for him to beat on me when I was in cuffs.[1]
Meanwhile, Jodi identified Peterson as her husband. At Officer Horner’s instruction, Jodi remained seated in the cab.
Officer Ballard collected Peterson’s billfold and license. After a background *844 check produced no record, Officer Ballard uncuffed and released Peterson. Peterson stated that the whole time his leg was pounding.
The Petersons got back into their truck and waited until about 7:00 a.m. to drive home. When they got there, Peterson undressed and discovered that his leg needed medical treatment. At the hospital, doctors diagnosed him with a ruptured femoral artery. The injury required two surgeries and a hospital stay that lasted almost two weeks.
Peterson filed this § 1983 action against only the City of Fort Worth, choosing not to sue Officers Horner and Ballard, whom he alleged violated his Fourth Amendment rights by unlawfully detaining him and by using excessive force, specifically the knee strike, to restrain him. The district court concluded that the detention was lawful and that the force was not excessive under the circumstances. The district court also concluded that, even if the officers had violated Peterson’s rights, the City was not liable because Peterson did not show that a policy, practice, or custom of the City was the moving force behind the officers’ conduct. The district court entered summary judgment for the City, and Peterson appeals. For reasons we explain below, we find sufficient evidence to establish his excessive force claim. Nevertheless, because we conclude that the record evidence will not support municipal liability for the alleged misconduct of the individual officers, we affirm judgment for the City.
II.
We review the district court’s grant of summary judgment de novo, applying the same legal standards as the district court. United States v. Corpus, 491 F.3d 205, 209 (5th Cir.2007). Summary judgment is appropriate only “if the pleadings, the discovery and disclosure materials on file, and any affidavits show that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law.” Fed. R. Civ. P. 56(c). In determining whether a genuine issue as to any material fact exists, we must view the evidence in the light most favorable to the nonmoving party. Corpus, 491 F.3d at 209. The nonmoving party “must identify specific evidence in the record and articulate the manner in which that evidence supports that party’s claim.” Johnson v. Deep East Tex. Reg’l Narcotics Trafficking Task Force, 379 F.3d 293, 308 (5th Cir.2004). The identified evidence “must be sufficient to sustain a finding in favor of the nonmovant on all issues as to which the nonmovant would bear the burden of proof at trial.” Id.
We address the threshold issue of whether officers violated Peterson’s Fourth Amendment rights before we address the issue of municipal liability.
III.
The Fourth Amendment guarantees the right to be free from unreasonable searches and seizures. “The Fourth Amendment does not proscribe all state-initiated searches and seizures; it merely proscribes those which are unreasonable.” See, e.g., Florida v. Jimeno, 500 U.S. 248, 250, 111 S.Ct. 1801, 114 L.Ed.2d 297 (1991) (citing Illinois v. Rodriguez, 497 U.S. 177, 110 S.Ct. 2793, 111 L.Ed.2d 148 (1990)). The touchstone of the Fourth Amendment is thus reasonableness. Id. (citing Katz v. United States, 389 U.S. 347, 360, 88 S.Ct. 507, 19 L.Ed.2d 576 (1967)). We measure reasonableness “in objective terms by examining the totality of the circumstances.” Ohio v. Robinette, 519 U.S. 33, 39, 117 S.Ct. 417, 136 L.Ed.2d 347 (1996).
Peterson alleges that officers violated his Fourth Amendment rights by *845 unlawfully detaining him and using excessive force to restrain him. Both unlawful detention and excessive force implicate the Fourth Amendment’s proscription against unreasonable seizures. See Terry v. Ohio, 392 U.S. 1, 16 n. 16, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968) (“[W]henever a police officer accosts an individual and restrains his freedom to walk away, he has ‘seized’ that person.”).
A.
We first address the alleged unlawful detention.
Peterson argues the officers had no lawful justification for entering his truck and detaining him because they had no reasonable suspicion to believe he had committed a crime. He contends the officers acted on the mere “neutral facts” that the Peter-sons were parked near drinking establishments and were asleep in their vehicle. Peterson argues that those neutral facts did not support reasonable suspicion and, without it, the officers had no lawful justification for detaining him.
The City counters, and the district court held, that the officers’ actions were reasonable in the light of their articulated concerns for the Petersons’ safety. The City points to deposition testimony in which the officers stated that they were concerned for the Petersons’ safety. Officer Horner testified that she tried to wake Peterson not because she suspected criminal activity but because “for his safety” she needed “to get compliance.” Officer Ballard testified that they “didn’t know if either one or two of them were simply intoxicated or had been hit in the head and left there, robbed.”
We face here the kind of officer-citizen encounter that is controlled by Terry v. Ohio, 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968). In Terry, the Supreme Court recognized that “[e]ncounters are initiated by the police for a wide variety of purposes, some of which are wholly unrelated to a desire to prosecute crime.” Id. at 13, 88 S.Ct. 1868. Terry itself addressed the kind of informal officer-citizen encounters that arise when officers make on-the-spot observations that require immediate action. Id. at 20, 88 S.Ct. 1868. In assessing the reasonableness of such actions, “there is ‘no ready test.’ ” Id. at 21, 88 S.Ct. 1868. Instead, a court must “ ‘focus upon the governmental interest which allegedly justifies official intrusion upon the constitutionally protected interests of the private citizen.’ ” Id. at 20-21, 88 S.Ct. 1868 (quoting Camara v. Mun. Ct., 387 U.S. 523, 536-37, 87 S.Ct. 1727, 18 L.Ed.2d 930 (1967)). The officer must be able to point to “specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion.” Id. at 21, 88 S.Ct. 1868. The court then asks: “would the facts available to the officer at the moment of the seizure or the search ‘warrant a man of reasonable caution in the belief that the action taken was appropriate?” Id. at 22, 88 S.Ct. 1868.
In other words, as we have previously stated: ‘We must attempt to put ourselves in the shoes of a reasonable police officer as he or she approaches a given situation and assesses the likelihood of danger in a particular context.” United States v. Rideau, 969 F.2d 1572, 1574 (5th Cir.1992) (en banc).
We agree with the district court that the detention was reasonable. The officers were responding to a call the Fort Worth Police Department received from a Stockyards security guard. The officers observed two persons, apparently unconscious, in a truck. It was early in the morning. The doors to the truck were unlocked. The persons were unresponsive *846 to the officers’ initial attempts to wake them. The officers had responsibilities for the persons’ safety; it was not apparent whether the persons “were simply intoxicated or had been hit in the head and left there, robbed.” The officers thus have pointed to “specific and articulable facts” that reasonably warranted their action. We think these facts clearly “warrant a man of reasonable caution in the belief’ that the officers’ actions were appropriate, and thus conclude this seizure was reasonable within the meaning of the Fourth Amendment. Accordingly, Peterson’s detention was not unlawful.
B.
With respect to the excessive force claim, Peterson argues the knee strike used by Officer Ballard was unnecessary and excessive. He contends that at the time Officer Ballard delivered the knee strike to his thigh, Peterson was in full compliance with all police orders and was offering no resistance. Jodi was seated in the truck cab and Peterson himself was handcuffed. Of the moments leading up to the knee strike, Peterson testified:
I can’t recall putting up any resistance; but I was being attacked by two people. I didn’t know they were police officers, because I just woke up when they drug me out of the truck. So I might have been — I know I was confused, and I didn’t know why I was being attacked ---- Is it possible I struggled? I don’t see much — there wasn’t much of a struggle from me .... It happened so fast there wasn’t any time to struggle. I was rolled over on my stomach, and both officers had my arms behind my back; and they put cuffs on me .... And one of them, I believe it was the man, had his knee on my neck .... [A]nd both of them pried my arms behind my back with brute force and put cuffs on me. And one of them was sitting on my back, and the other one had his knee on my neck grinding my face .... I couldn’t do anything. I don’t think I struggled.
The City argues that Peterson was belligerent and the knee strike was necessary to restrain him. The City points to deposition testimony in which Officer Horner stated that Peterson kicked at her and hit her forearm when she first tried to wake him. Officer Ballard stated that outside of the truck Peterson struggled to escape his grasp. In Officer Ballard’s words, Peterson “still continued to fail to comply. He wouldn’t stand still. He was pulling away from us .... He [took] an aggressive stance toward us and [did] not [comply] to what we’re asking him to do.”
Our precedent requires that to establish a claim of excessive force, a plaintiff must show that, in addition to being seized, he suffered “(1) an injury that (2) resulted directly and only from the use of force that was excessive to the need and that (3) the force used was objectively unreasonable.” Ballard v. Burton, 444 F.3d 391, 402 (5th Cir.2006) (quoting Flores v. City of Palacios, 381 F.3d 391, 396 (5th Cir.2004)). There is no dispute that Peterson suffered an injury and, for purposes of its motion for summary judgment, the City conceded that Officer Ballard delivered a knee strike to Peterson’s thigh. The question is whether that knee strike was excessive to the need and therefore objectively unreasonable. We determine whether the force was excessive “from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight.” Graham v. Connor, 490 U.S. 386, 396, 109 S.Ct. 1865, 104 L.Ed.2d 443 (1989); see also Ballard, 444 F.3d at 402.
The district court held that the knee strike was not excessive. The district *847 court pointed out that the evidence showed that Peterson had been drinking, and that he hit Officer Horner on the forearm and resisted Officer Ballard’s efforts to restrain him. The district court observed that Peterson’s own testimony did not contradict the officers’ testimony that Peterson had resisted compliance; Peterson stated that “there wasn’t much of a struggle,” but he did not deny resisting the officers.
We agree that the conflicting testimony does not rule out the possibility that some force may have been reasonable to restrain Peterson. But the evidence supporting the reasonableness of the police response is clearly disputed concerning whether continuing force in the form of a knee strike was justifiable after Peterson had been handcuffed. Peterson unequivocally testified that Officer Ballard did not strike him until after he had been handcuffed.
Nor does it escape our notice that the City conceded that Officer Ballard struck Peterson with his knee, yet Officer Ballard himself denied that he struck Peterson. Officer Ballard testified that Peterson resisted, but only minimally, such that a knee strike would have been unnecessary.
Thus, the existing evidence raises unresolved questions about what occurred. We therefore hold that the evidence creates a genuine issue of material fact as to whether, from the perspective of a reasonable officer on the scene, the knee strike was excessive and therefore objectively unreasonable. Summary judgment as to Peterson’s excessive force claim was therefore improper.
IV.
The question now becomes whether summary judgment was nonetheless proper as to the City’s liability for the alleged misconduct of its officers.
A.
We will begin with the basic principles of municipal liability for the misconduct of its employees in § 1983 actions.
It is well-established that a city is not liable under § 1983 on the theory of respondeat superior. Monell, 436 U.S. at 694, 98 S.Ct. 2018; Johnson, 379 F.3d at 308. A municipality is almost never liable for an isolated unconstitutional act on the part of an employee; it is liable only for acts directly attributable to it “through some official action or imprimatur.” Piotrowski v. City of Houston, 237 F.3d 567, 578 (5th Cir.2001). To establish municipal liability under § 1983, a plaintiff must show that (1) an official policy (2) promulgated by the municipal policymaker (3) was the moving force behind the violation of a constitutional right. Id.
Official policy establishes culpability, and can arise in various forms. It usually exists in the form of written policy statements, ordinances, or regulations, but it may also arise in the form of a widespread practice that is “so common and well-settled as to constitute a custom that fairly represents municipal policy.” Id. at 579 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc)).
A policy or custom is official only “when it results from the decision or acquiescence of the municipal officer or body with ‘final policymaking authority’ over the subject matter of the offending policy.” Jett v. Dallas Indep. Sch. Dist., 491 U.S. 701, 737, 109 S.Ct. 2702, 105 L.Ed.2d 598 (1989). Thus, a plaintiff must show the policy was promulgated by the municipality’s policymaker. There is no “de facto” final policymaking authority. See Gros v. City of Grand Prairie, Tex., *848 181 F.3d 613, 616 n. 2 (5th Cir.1999) (quoting City of St. Louis v. Praprotnik, 485 U.S. 112, 131, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988)). Here the parties agree that Chief Mendoza has final policymaking authority over the Fort Worth Police Department.
Finally, a plaintiff must establish that the policy was the moving force behind the violation. In other words, a plaintiff must show direct causation. See Piotrowski, 237 F.3d at 580. This means “there must be a direct causal link” between the policy and the violation. Id.; see also Johnson, 379 F.3d at 310 (quoting Fraire v. City of Arlington, 957 F.2d 1268, 1281 (5th Cir.1992) (“must be more than a mere ‘but for’ ”)).
Peterson acknowledges that there is no official written or otherwise specially articulated policy upon which he can rely. Nevertheless, he advances several theories of municipal liability. He alleges that the use of excessive force by Fort Worth Police Department officers is so common, and well known to the policymakers, that it constitutes a custom that fairly represents official policy. In addition, he alleges the City is also liable because it ratified the use of excessive force in this case and generally failed either to train or supervise its officers.
B.
Because we can quickly conclude that the City is not liable for any violation under the theories of ratification or failure to train or supervise, we address those arguments first.
Peterson alleges the City is liable because Chief Mendoza ratified the officers’ conduct. He points out that Chief Mendoza determined after investigation that Officers Horner and Ballard’s conduct complied with the department’s policies. Peterson cites City of St. Louis v. Praprotnik, 485 U.S. 112, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988), which acknowledges that “[i]f the authorized policymakers approve a subordinate’s decision and the basis for it, their ratification would be chargeable to the municipality because their decision is final.” Id. at 127, 108 S.Ct. 915. But our precedent has limited the theory of ratification to “extreme factual situations.” See Snyder v. Trepagnier, 142 F.3d 791, 798 (5th Cir.1998). Under that precedent, we cannot say that this case presents an extreme factual situation. Compare Grandstaff v. City of Borger, 767 F.2d 161 (5th Cir.1985) (finding ratification in case in which officers “poured” gunfire onto a truck and killed innocent occupant), with Snyder, 142 F.3d at 798 (refusing to find ratification in case in which officer shot fleeing suspect in the back). Moreover, we have also explained that a policymaker who defends conduct that is later shown to be unlawful does not necessarily incur liability on behalf of the municipality. See Coon v. Ledbetter, 780 F.2d 1158, 1161-62 (5th Cir.1986) (precedent “does not stand for the broad proposition that if a policymaker defends his subordinates and if those subordinates are later found to have broken the law, then the illegal behavior can be assumed to have resulted from an official policy”). Our precedent thus forecloses ratification liability in this case.[2]
*849 Peterson also alleges that the City was deliberately indifferent to the obvious need for training on the risk of injuries from knee strikes. He points to Officer Ballard’s testimony that he did not “recall being told that there was any risk of injury from a knee strike” nor that training “may have made a difference” in his evaluation of the use of force. The failure to train can amount to a policy if there is deliberate indifference to an obvious need for training where citizens are likely to lose their constitutional rights on account of novices in law enforcement. See Brown v. Bryan Co., Okla., 219 F.3d 450, 458 (5th Cir.2000). “[U]nder certain circumstances, § 1983 liability can attach for a single decision not to train an individual officer even where there has been no pattern of previous constitutional violations.” Id. at 459. But those circumstances are not present here. We have previously held that to hold a municipality liable for failure to train an officer, it must have been obvious that “the highly predictable consequence of not training” its officers was that they “would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.” Id. at 461. Peterson points to no evidence that the City was aware of any risk of injury from knee strikes, and the City showed that officers otherwise go through extensive training on the use of force. Particularly in the absence of evidence that the use of knee strikes had caused serious injuries on previous occasions, Peterson has presented no material fact question to show that it should have been obvious to the policymakers that the risk of serious injury was a “highly predictable consequence” of the failure to train. See Estate of Davis ex rel. McCully v. City of North Richmond Hills, 406 F.3d 375, 383, 386 (5th Cir.2005) (deliberate indifference usually requires “ ‘at least a pattern of similar incidents in which the citizens were injured’ ” (citation omitted), and “narrow” single incident exception has applied when the court finds a complete failure to train, not just a failure to train in “one limited area”).[3]
*850 In a similar vein, Peterson alleges the City was deliberately indifferent to the need to supervise its officers adequately. Again, for the City to be liable for failure to supervise, it at least must have been obvious that “the highly predictable consequence” of not supervising its officers was that they “would apply force in such a way that the Fourth Amendment rights of [citizens] were at risk.” Id. at 461. As an example of the department’s failure to supervise, Peterson points to the fact that Officer Horner failed to fill out a use of force report, in violation of department policy, after she witnessed Officer Ballard use force on Peterson. Even assuming this to be true, however, the department did demonstrate some supervision by conducting a thorough internal affairs investigation into the incident and into a possible misstatement made in Officer Horner’s activity report. The department’s failure to reprimand one officer for an instance of faulty record-keeping would not alone raise a genuine issue of material fact on whether the obvious and “highly predictable consequence” of the department’s actions was that citizens’ Fourth Amendment rights would be violated, and Peterson has otherwise provided no evidence of inadequate supervision. We find no evidentiary support to submit municipal liability to the jury on the theory that the department failed to supervise its officers.
Accordingly, the district court properly held on summary judgment that the City is not liable for any violation under the theories of ratification or failure to train or supervise.
C.
Finally, we address whether Peterson has presented sufficient evidence to establish a fact question for municipal liability on the basis that the City maintained an official policy that was permissive of excessive force. As we have stated, Peterson must show some evidence to support that an official policy of the City was the moving force behind the excessive force that violated his Fourth Amendment rights. Piotrowski, 237 F.3d at 578. He concedes that there is no written policy supporting his claim of municipal liability. Instead he argues that a pattern of excessive force in making arrests establishes that the City maintained an unwritten policy that was permissive of the use of excessive force. In support, he points to 27 complaints of excessive force between 2002 and 2005. The legal question thus presented is whether the 27 complaints on which Peterson relies are sufficient to establish a pattern of excessive force that can be said to represent official policy.
A pattern is tantamount to official policy when it is “so common and well-settled as to constitute a custom that fairly represents municipal policy.” Id. at 579 (quoting Webster v. City of Houston, 735 F.2d 838, 841 (5th Cir.1984) (en banc)). Where prior incidents are used to prove a pattern, they “must have occurred for so long or so frequently that the course of conduct warrants the attribution to the governing body of knowledge that the objectionable conduct is the expected, accepted practice of city employees.” Webster, 735 F.2d at 842. It is thus clear that a plaintiff must demonstrate “a pattern of *851 abuses that transcends the error made in a single case.” Piotrowski, 237 F.3d at 582 (citations omitted). A pattern requires similarity and specificity; “[p]rior indications cannot simply be for any and all ‘bad’ or unwise acts, but rather must point to the specific violation in question.” Estate of Davis ex rel. McCully v. City of North Richland Hills, 406 F.3d 375, 383 (5th Cir.2005).
A pattern also requires “sufficiently numerous prior incidents,” as opposed to “isolated instances.” McConney v. City of Houston, 863 F.2d 1180, 1184 (5th Cir.1989). In Pineda v. City of Houston, 291 F.3d 325 (5th Cir.2002), we held that eleven incidents of warrantless entry did not support a pattern of unconstitutional warrantless entry. In each of those eleven incidents, officers reported either consent or exigent circumstances. Id. at 329 n. 12. We observed that “[ejleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation’s largest cities and police forces.” Id. at 329.
The district court, relying on Pineda, held that the 27 complaints on which Peterson relies were insufficient to establish a pattern of excessive force. After careful examination of the record, we conclude the district court did not err.
Peterson presented evidence that, according to the City’s internal affairs records, at least 27 complaints of excessive force were filed between 2002 and 2005. Almost all arose from officers’ investigations of what may be called small crimes; the injuries suffered, however, ranged from minor lacerations to broken bones. In one incident, officers allegedly stopped a suspect who was riding a bicycle and, after he had dismounted the bicycle and lay on the ground, beat him until his face bled and his nose and eye socket were fractured. In another incident, an officer who detained an individual as a suspect in the burglary of a car wash knee-struck him in the back and broke his jaw; that individual turned out to be, not a suspect, but one of the car wash’s owners. In yet another incident, officers allegedly punched and beat a suspect until he suffered a head injury; although the officers claimed that the suspect was carrying a crack pipe, they were unable to produce the pipe. And finally, in an even more alarming incident, officers responding to a call alleging tampering with an electrical box entered an apartment without a warrant and allegedly tased an individual until he was unconscious and had stopped breathing.
The incidents allege use of force that, if true, would be emphatically excessive. Nevertheless, assuming their truth, the incidents do not, on the basis of this record, tell us that the City maintained an official policy of condoning excessive force. The failure of the evidence is that the plaintiffs have failed to provide context that would show a pattern of establishing a municipal policy.[4] For example, the record does not indicate the size of the Fort Worth Police Department or how many arrests were made by the department between 2002 and 2005. We have previously indicated that the size of a police department may be relevant to determining whether a series of incidents can be called a pattern. Pine *852 da, 291 F.3d at 329 (“Eleven incidents each ultimately offering equivocal evidence of compliance with the Fourth Amendment cannot support a pattern of illegality in one of the Nation’s largest cities and police forces.”). Although the record omits any evidence of the department’s size or the number of its arrests, the department’s own website indicates that it presently employs more than 1,500 officers, and that there were more than 67,000 incidents of crime in the last year alone. Given the department’s size, and absent any evidence of its total number of arrests during the same time period, 27 incidents of excessive force over a period of four years do not reflect a pattern that can be said to represent official policy of condoning excessive force so as to hold the City liable for the acts of its employees’ unconstitutional conduct. To hold otherwise would be effectively to hold the City liable on the theory of respondeat superior, which is expressly prohibited by Monell. See 436 U.S. at 694, 98 S.Ct. 2018.
The record does indicate that for each of the 27 complaints of excessive force the department conducted an internal investigation, a fact that would appear to cut against the argument that the City condoned the use of excessive force. The City itself has relied on the fact that only four of the 27 complaints were “sustained” after investigation and, indeed, in each of the incidents described above, the department found the complaint of excessive force either “not sustained” or “unfounded.” However, that the department itself vaguely ruled most of its complaints “not sustained” or “unfounded” is no assurance that these investigations exonerate the City. To the contrary, that only four of the 27 complaints were “sustained” after investigation may tilt in Peterson’s favor. Nevertheless, even assuming error in the unsustained investigations, the record as a whole will not support a legal conclusion that the City maintained an official policy of condoning excessive force.
In sum, the 27 incidents, in the context of this record, do not suggest a pattern “so common and well-settled as to constitute a custom that fairly represents municipal policy.” Piotrowski, 237 F.3d at 579.
V.
In conclusion, there was sufficient evidence to establish Peterson’s' excessive force claim. Peterson, however, did not sue the officer or officers who violated his constitutional rights. Instead he sought to impose liability on the City of Fort Worth for the misconduct of its employees. In this connection, he failed to produce evidence to satisfy the demanding standards required by Monell and its progeny to hold the City liable, all for the reasons we have detailed in this opinion. Accordingly, the judgment of the district court is
AFFIRMED.

. Officer Ballard denies that he cursed at Peterson and delivered a knee strike to Peterson’s thigh. He stated that Peterson's resistance was minimal, and that a knee strike was unnecessary. Officer Horner, however, observed the knee strike and called it "an approved distraction technique.” For the purposes of its motion for summary judgment, the City conceded that Officer Ballard delivered a knee strike to Peterson's thigh.

. The dissent acknowledges that ratification is "seldom, if ever, found by this court.” It maintains, however, that Peterson put forth evidence of ratification sufficient to withstand summary judgment by showing that neither Officer Ballard nor Officer Horner was disciplined for the use of force or failure to file a “Use of Force Report” following the incident, and by pointing to Chief Mendoza's deposition testimony that both officers complied with the City’s policies and procedures. However, this evidence, viewed in the light *849 most favorable to Peterson, is insufficient to create a fact issue regarding the City’s policymaker’s ratification of unconstitutional conduct. In City of St. Louis v. Praprotnik, a case on which Peterson relies, the Supreme Court emphasized that ’’[s]imply going along with discretionary decisions made by one’s subordinates, however, is not a delegation to them of the authority to make policy ....” 485 U.S. 112, 130, 108 S.Ct. 915, 99 L.Ed.2d 107 (1988). Additionally, "the mere failure to investigate the basis of a subordinate’s discretionary decisions does not amount to a delegation of policymaking authority .... ” Id. See also Kibbe v. City of Springfield, 777 F.2d 801, 809 n. 7 (1st Cir.1985) ("The [district] court suggested that the City had ratified defendant Perry's action by clearing him and finding that he had acted in accordance with the police department’s policies. We are unconvinced that a failure to discipline Perry or other officers amounts to the sort of ratification from which a jury properly could infer municipal policy.”).
The dissent also acknowledges that ratification applies only in "extreme factual situations.” It maintains, however, that our conclusion that this was not an "extreme factual situation” is a "factual determination,” which we are not permitted to make. On the contrary, our conclusion rests on a legal determination that the facts here, even viewed in the light most favorable to Peterson, do not satisfy the legal standard set out in our ratification caselaw.

. Though the evidence cited by the dissent may create a factual dispute as to whether the City’s police officers received sufficient training on the practice and consequences of knee strikes, "that a particular officer may be unsatisfactorily trained will not alone suffice to fasten liability on the city .... ” City of Canton v. Harris, 489 U.S. 378, 390, 109 S.Ct. 1197, 103 L.Ed.2d 412 (1989). Rather, the "vigorous test” of "deliberate indifference,” Brown, 219 F.3d at 461, is required because a "lesser standard of fault would result in de facto respondeat superior liability on munici *850 palities-a result [the Supreme Court] rejected in Monell." Canton, 489 U.S. at 392, 109 S.Ct. 1197. Here, no reasonable jury could conclude that a risk of injury to citizens was the "obvious,” "highly predictable consequence” of a lack of knee strike training, as Peterson has not shown that the City had "sufficient notice” that knee strikes were frequently used, particularly dangerous, or had previously resulted in injury, much less an injury of the type experienced by Peterson. Brown, 219 F.3d at 458.

. Twenty-seven incidents in four years, with no context as to the overall number of arrests or any comparisons to other cities, is not sufficient evidence of a pattern rising to the level of a policy. The burden of providing a context that would show such a pattern falls on the plaintiff, not on the City, and Peterson has failed to meet that burden. No reasonable jury could conclude based on Peterson's evidence that the City had established a municipal policy of using or condoning excessive force.