FILED
United States Court of Appeals
Tenth Circuit

June 5, 2013

Elisabeth A. Shumaker
Clerk of Court

**UNITED STATES COURT OF APPEALS**

**FOR THE TENTH CIRCUIT**

---

AMANDA BAILEY,

      Plaintiff-Appellant,

v.

JOEL KERNS, Sheriff of Pittsburg
County, Oklahoma, in his official
capacity,

      Defendant-Appellee.

No. 12-7069
(D.C. No. 6:11-CV-00264-JHP)
(E.D. Okla.)

---

**ORDER AND JUDGMENT**[*]

---

Before **KELLY**, Circuit Judge, **PORFILIO**, Senior Circuit Judge, and **HOLMES**, Circuit Judge.

---

Plaintiff Amanda Bailey, a former detainee at the Pittsburg County jail,

appeals from a district court order granting summary judgment to defendant Sheriff

Joel Kerns on an official-capacity claim she asserted against him under 42 U.S.C.

§ 1983.  Ms. Bailey had sought to hold Sheriff Kerns, and through him the County,

---

[*]    After examining the briefs and appellate record, this panel has determined unanimously that oral argument would not materially assist the determination of this appeal.  *See* Fed. R. App. P. 34(a)(2); 10th Cir. R. 34.1(G).  The case is therefore ordered submitted without oral argument.  This order and judgment is not binding precedent, except under the doctrines of law of the case, res judicata, and collateral estoppel.  It may be cited, however, for its persuasive value consistent with Fed. R. App. P. 32.1 and 10th Cir. R. 32.1.

responsible for the failure of jail staff to provide or obtain medical care for an infection that ultimately led to the amputation of her right arm. We affirm for substantially the reasons explained by the district court.

## I. SUMMARY OF RELEVANT EVENTS

Most of the material facts are not in dispute. Where the parties' versions of events diverge, we must, of course, view the evidence in the light most favorable to Ms. Bailey, the non-moving party. *Porro v. Barnes*, 624 F.3d 1322, 1325 (10th Cir. 2010). While our ultimate focus is on the liability of Sheriff Kerns, who did not personally participate in the events involving Ms. Bailey's brief detention at the jail, a proper analysis of his indirect liability requires an understanding of the actions of jail personnel who did personally interact with Ms. Bailey.

First, some general features of the jail's operation should be clarified. The jail does not have a staff physician. The only full-time medical professional is Nurse Doris Barlow, who is present from eight to five o'clock during the week. During the relevant time period, a physician's assistant visited on Wednesdays, though that has since been discontinued. Nurse Barlow examines inmates and dispenses medication. Jail staff may provide over-the-counter medicine, but for more serious matters arising when Nurse Barlow is not there, the jail administrator must be contacted. Treatment by physicians is handled through an arrangement with a nearby hospital, as the jail's written standards explain: "The McAlester Regional Hospital and the Ambulance Service provide this facility with the necessary medical services to inmates and

department personnel on an as needed basis. Due to the close proximity to this facility, medical care is less than five minutes away and available to use twenty-four hours a day." App. at 231. An intake medical screening, involving observation and verbal questioning, is done when an inmate first arrives and "[i]f the need is indicated by the medical screening, the prisoner will be transported to the McAlester Hospital Emergency Room, and will be examined by a qualified licensed medical doctor." *Id.* at 227. The final decision whether a medical condition warrants transportation of an inmate to the hospital (by jail transport or ambulance) is made by the jail administrator, although prison staff may order an inmate taken to the hospital if immediate care is deemed necessary, *id.* at 216, 512-13.

Admission into the Jail Sunday Night

Ms. Bailey was arrested and brought to the jail after midnight on Sunday, January 3, 2010. Her right arm was in a splint. She told intake officer Leann Drake that she had been treated (under an alias) at the McAlester Hospital emergency room earlier that evening for a fracture. Officer Drake marked the "yes" box on the jail medical questionnaire in answer to the question "Does Inmate have any visible signs of trauma, illness, obvious pain or bleeding, requiring immediate emergency or doctor's care?" App. at 162 (adding explanatory note indicating "broken left arm"). This did not, however, prompt an immediate (return) trip to the hospital for Ms. Bailey. The questionnaire refers in the disjunctive to "immediate emergency" care *or* "doctor's" care, and Officer Drake explained at her deposition that checking the

"yes" box does not necessarily mean anything must be done right away, though if an immediate need for care is evident, it is addressed.

Ms. Bailey insists she also indicated that she had been given prescriptions for a pain reliever and an antibiotic at the emergency room. Yet the questionnaire's boxes for current medications and prescriptions were marked "no." *Id.* at 163, 164. Officer Drake testified that Ms. Bailey denied having any prescriptions, but, as noted above, we must credit Ms. Bailey's version of these events for purposes of summary judgment. Ms. Bailey contends she complained of pain and repeatedly asked to be taken to the emergency room during her first night in the jail, but officers on duty just told her the nurse would be seeing her and could bring her something for pain.

Interaction with Nurse Barlow on Monday

Nurse Barlow first saw Ms. Bailey early Monday while doing her morning rounds. Ms. Bailey told her about going to the emergency room the previous day and receiving the prescriptions for pain medication and antibiotics. Ms. Bailey did not have the prescriptions with her, so Nurse Barlow said she would get Ms. Bailey some over-the-counter pain medication and check into the prescriptions. Upon learning that the prescriptions were obtained under a false name, Nurse Barlow said she could not fill them. She told Ms. Bailey that a physician's assistant would visit the jail on Wednesday and that, if Ms. Bailey were still there, the situation could be resolved then. Nurse Barlow, who knew Ms. Bailey was being held for a Texas offense and had a court hearing that day (at which she waived extradition), explained that she

- 4 -

normally waits to see what happens at court to determine how she needs to proceed with a detainee, since some are discharged or transferred. In any event, she testified that notwithstanding Ms. Bailey's complaints of pain and swelling and the knowledge that medication prescribed for her had not yet been obtained, she did not think Ms. Bailey's condition was serious enough to warrant a trip to the emergency room on Monday. When she left for the day, she just told jail staff they could provide Ms. Bailey over-the-counter pain medication.

Worsening Condition Monday Night

Ms. Bailey's condition worsened through the afternoon and evening. She continued to complain of pain and swelling, but jail staff gave her nothing more than over-the-counter medication. In the meantime, Texas authorities contacted the jail to say they had found a suicide note written by Ms. Bailey, prompting staff to move her to a room designed for observation of suicidal detainees. During the night she became feverish, dizzy, and nauseous, vomited once, and developed diarrhea, but the guards did not accede to her repeated requests to be taken to the emergency room.

Tuesday Morning

When Nurse Barlow visited the suicide room in the morning, she found Ms. Bailey crying, distraught, and in severe pain. She observed increased swelling in Ms. Bailey's fingers and, checking capillary refill, noted circulation was not good. Realizing Ms. Bailey's condition could not wait until Wednesday, Nurse Barlow told her something would be done that day and left to speak with the jail administrator.

They decided that Ms. Bailey should be taken to the hospital as soon as a jail transport officer was available but that an ambulance need not be called to take her immediately. Although Nurse Barlow admitted she could have called an ambulance, she felt there was nothing life- or limb-threatening in Ms. Bailey's condition and concluded that, notwithstanding the extreme pain Ms. Bailey displayed, emergency transportation to the hospital was not necessary. Between two and three hours passed before a transport officer was able to take Ms. Bailey to the hospital.

## Hospitalization and Amputation

When she arrived at the hospital, Ms. Bailey was in renal failure attributed to sepsis, vomiting, and dehydration. She was treated for a streptococcal infection of her right arm and underwent multiple surgeries for compartment syndrome. Six days later, she was released and transferred to a Texas correctional facility. But medical complications continued and she ultimately had to have her arm amputated.

## II. DISTRICT COURT PROCEEDINGS AND DECISION

Ms. Bailey initially brought this action asserting deliberate-indifference claims against several individual defendants in their personal and official capacities. While the defendants' motion for summary judgment was pending, the parties entered into a "Joint Stipulation of Dismissal with Prejudice," dismissing all claims except the official-capacity claim against Sheriff Kerns. App. at 532. Sheriff Kerns submitted a separate brief in support of summary judgment to which Ms. Bailey responded, setting the matter up for the final disposition of the case.

The district court determined that "even assuming, *arguendo*, that the care provided [Ms. Bailey] by [jail] employees during her 35 hour incarceration was so woefully inadequate as to evidence deliberate indifference to [her] serious medical need, [she] still cannot succeed on an official capacity claim against [Sheriff] Kerns." *Id.* at 588-89. Such a claim, of course, requires a constitutional violation proceeding from a jail policy, custom, or practice, or from training or supervision of jail staff so inadequate as to evince a deliberate indifference to detainees. *See Bd. of Cnty. Comm'rs v. Brown*, 520 U.S. 397, 403-04, 407-09 (1997) (discussing *City of Canton v. Harris*, 489 U.S. 378, 387-90 (1989), and *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 689-694 (1978)).

In reaching its determination, the district court considered the episodes set out above and concluded that any deliberate indifference or medical negligence involved arose from "lapses in judgment by skilled employees" entrusted with particular decisions, not from policies, customs, or practices.[1] App. at 591-94. The court similarly dismissed Ms. Bailey's allegation that jail cost-cutting practices improperly prioritized budget concerns over medical care, concluding that she "focuses on acts of apparent employee negligence but fails to offer competent evidence showing that

---

[1]  Ms. Bailey argued that Sheriff Kerns, final policymaker for the jail, admitted her injuries were the result of jail policy when he testified that members of staff acted in compliance with policy when they made the decisions about which she complains. We agree with the district court that such comments about staff's proper exercise of decision-making authority does not show that the *content* of their judgments were jail policy.

those acts or omissions were committed in an effort to conform with the cost-saving practices cited," and hence "fails to raise a question of material fact as to whether such cost-saving practices were the moving force behind [her] injury."[2]  *Id.* at 597.

Turning to training and supervision, the district court cited evidence showing the jail "had training in place to provide for inmate medical care in order to prevent the constitutional harm complained of by the Plaintiff."  *Id.* at 599.  "Further, Plaintiff cannot show a pattern of conduct that would have put [Sheriff Kerns] on notice that employee training or his supervision of the employees regarding that training was inadequate."  *Id.*  Indeed, she "fail[ed] to offer evidence of even one other incident that could have given policymakers notice that employee training in the relevant policies and procedures was insufficient or that those policies were not being implemented."  *Id.* at 599-600.  In sum, the stringent standards for imposing municipal liability on this basis could not be met.  *See generally Porro*, 624 F.3d at 1528.

Finally, the district court rejected Ms. Bailey's claims that inadequate jail staffing contributed to her injuries, particularly with respect to the two-to-three-hour

---

[2]  Ms. Bailey noted the jail seeks to hold down medical costs by, for example, billing released detainees for treatment given for pre-existing injuries and (as Nurse Barlow testified) normally waiting for the result of a new detainee's initial court appearance before proceeding with medical care.  The district court explained that the former practice was irrelevant to Ms. Bailey's case and that there was no evidence the latter practice played a role in Nurse Barlow's decision not to send Ms. Bailey to the hospital on Monday, which was made only after she determined, in the exercise of her professional judgment, that an emergency room visit was not medically necessary.  *See* App. at 595-96.

wait for a jail transport officer to take her to the hospital. App. at 600. The court recognized this as just one more instance of an employee judgment-call being cited inaptly as an exemplar of jail policy:

> Upon finding the noticeably ill Plaintiff, Nurse Barlow and Jail Administrator Eldridge determined that Plaintiff's condition, although serious, was not life threatening and did not require an ambulance. . . . As the Court has previously stated, any injury caused by this wait was the result of an employee judgment call to wait rather than call an ambulance. It cannot be fairly attributed to any policy related to the staffing of the [jail]. Consequently, Plaintiff fails to raise a material question of fact as to whether any policy of understaffing may have caused Plaintiff's injury.

*Id.* at 600-01.

### III. AFFIRMANCE OF SUMMARY JUDGMENT

We review the grant of summary judgment de novo, under the same standard applied by the district court. *Brammer-Hoelter v. Twin Peaks Charter Acad.*, 602 F.3d 1175, 1184 (10th Cir. 2010). Upon consideration of the evidentiary record in light of the arguments advanced by the parties, we affirm for substantially the reasons stated in the district court's thorough opinion and order. We do, however, briefly address one particular point raised by Ms. Bailey on appeal that warrants additional comment.

Ms. Bailey devotes much of her briefing on appeal to arguing that Sheriff Kerns "ratified" the decisions of jail staff when he indicated in his deposition that he felt they had acted in compliance with jail policy, thereby raising their decisions to the level of jail policy. *See generally id.* at 1189 (noting municipal liability may be

based on "ratification by . . . final policymakers of the decisions—and the basis for them—of subordinates to whom authority was delegated subject to the[] policymakers' review and approval."). And she complains that the district court completely failed to consider this basis for liability. But the district court's silence on ratification is understandable in that Ms. Bailey neither alleged it as a basis for liability in her complaint nor argued it in opposition to Sheriff Kerns' summary judgment motion. While she cited to the Sheriff's deposition testimony, she did so only to suggest his acknowledgment of policy, not his creation of policy through ratification. *See supra* note 1. In short, Ms. Bailey forfeited this potential theory of liability and we decline to consider it as a basis for disturbing the district court's judgment.[3] *See, e.g.*, *Hansen v. PT Bank Negara Indonesia (Persero)*, 706 F.3d 1244, 1249 (10th Cir. 2013).

The judgment of the district court is affirmed.

Entered for the Court

Paul J. Kelly, Jr.
Circuit Judge

---

[3] By noting this forfeiture, we do not imply the ratification theory otherwise would have succeeded. Simply opining in a deposition that staff acted properly does not necessarily constitute an authoritative ratification of a decision delegated subject to the policymaker's review and approval, so as to enshrine it as official policy. *See, e.g.*, *Peterson v. City of Fort Worth*, 588 F.3d 838, 848 n.2 (5th Cir. 2009) (holding police chief's deposition testimony that officers acted in compliance with policy insufficient to support ratification theory).

- 10 -