# United States Court of Appeals for the Fifth Circuit

---

No. 23-30448

---

Lily Howard,

*Plaintiff—Appellant*,

*versus*

Brookshire Grocery Company, *doing business as* Super 1 Foods,

*Defendant—Appellee*.

---

Appeal from the United States District Court
for the Western District of Louisiana
USDC No. 6:22-CV-1482

---

Before Richman, Graves, and Ramirez, *Circuit Judges*.
Priscilla Richman, *Circuit Judge*:[*]

Lily Howard sued Brookshire Grocery Company for negligence after she slipped and fell in a puddle in a grocery store Brookshire operated. The district court granted summary judgment to Brookshire, reasoning that Howard did not meet her burden of showing that Brookshire either created the puddle or had actual or constructive notice of it, as required by

---

[*] This opinion is not designated for publication. *See* 5th Cir. R. 47.5.

No. 23-30448

Louisiana's Merchant Liability Act.[1]  We affirm.

## I

Brookshire operates a Super 1 Foods Store in Lafayette, Louisiana. While pushing a shopping cart in between a row of meat freezers and coolers at that store, Howard slipped and fell on a mixture of water and ice that she described as similar to crushed ice.  A store surveillance camera recorded the events in that aisle starting an hour before Howard's fall and ending thirty minutes after it, though it captured no audio of the events.

The footage shows that, starting approximately nineteen minutes before Howard fell, two store employees were unloading frozen and chilled meat products from boxes into the freezers and coolers that lined the aisle. Specifically, Dale Faulk was unloading products into the freezers, and Marcus Adams was unloading products into the coolers.  For about nine minutes during that process, the cart holding the products that Adams unloaded into a fresh meat cooler was situated over the area where Howard later fell.  The store employees left with their carts in tow after they finished their respective tasks, with Adams departing about ten minutes prior to Howard's fall and Faulk departing about seven minutes prior to the fall.

Brookshire employee Edith Harris explained that the aisle in which Howard fell houses freezers along the wall and coolers or refrigerators with "no ice" in the "middle boxes."  Various Brookshire employees testified in depositions that there is no ice in the fresh meat refrigerators next to the spill where Howard fell.  Harris acknowledged that employees sometimes place "a bag of fresh shrimps that might be frozen" in the refrigerator, but she did not indicate that there would be ice on those products.  Harris further

---

[1] La. Rev. Stat. Ann. § 9.2800.6(B).

2

testified that the racks on which meat is transported to the store floor for unloading do not have condensation on them when they "come[] out to the floor." However, one employee testified that the freezers near the spill "don't freeze up where [they] ha[ve] ice in [them]," and Harris mentioned that several freezers in the general vicinity contain ice. Viewing the facts in the light most favorable to Howard, we assume that there is ice in some of the nearby freezers. Even though multiple employees testified that, in their experience, ice does not accumulate and fall off the products stored in those freezers, Harris testified that there is an employee whose job entails "monitor[ing] the area in front of the freezer to see if there are any puddles and clean[ing] them up."

Soon after the employees departed, store director Lester Washington walked directly over the spot where Howard would soon fall. He later testified that he did not see anything on the floor when he walked through the area. About two minutes after Washington walked past, Howard slipped and fell forward as she pushed her cart down the aisle, with one of her legs going under the cart. Howard testified in her deposition that "[w]hen I fell I knew I was wet on the back of my pants, on my butt, kind of like down the leg area that was caught, that had got stuck on the tip of [the] basket, whatever it did to me, the cut on my leg. I was still in the water and I knew it was ice down there because I was still in ice."

Washington, who had re-emerged through a side door in the right of the video frame just before Howard's fall, immediately came over to help Howard up, and Howard resumed shopping. As Howard walked away with her cart, Washington examined the floor around the fall and haled over another store employee, Edna Dauphine. Dauphine took photos of the floor in the general vicinity of the fall. The photos admitted into evidence do not appear to show a great deal of water on the floor. However, Howard described the spill as covering a "large area," and in the video, Dauphine

initially spent about eighty seconds wiping down the aisle, covering a broad area of several square yards around the fall on the right side of the aisle near the coolers, including up to the edge of the bottom of the coolers. She stopped briefly to speak with Washington and then resumed cleaning once more. After another conversation with Washington, Dauphine and Washington both departed the frame of the video and the scene of Howard's fall for the final time.

Howard sued Brookshire for negligence in state court. Brookshire removed the suit to federal district court on the basis of diversity jurisdiction. As part of discovery, Howard retained an expert who tested Brookshire's floors near the area of the fall and concluded that the floor "is not slip-resistant whether dry or wet with water and [is] therefore unsafe for pedestrian traffic whether dry or wet with water," but he did not offer a conclusion on the actual reason for the lack of slip-resistance. Brookshire moved in limine to exclude this expert's report and testimony.

Brookshire ultimately moved for summary judgment, which the district court granted while simultaneously denying as moot Brookshire's motion in limine regarding Howard's expert. Regarding the motion for summary judgment, the district court determined that Howard had failed to create a genuine dispute of material fact as to Brookshire's creation of the hazard or actual or constructive notice of it, and the district court did not discuss any other issues in its opinion. Following the district court's entry of summary judgment on Howard's negligence claim, Howard timely appealed.

## II

We review a grant of summary judgment de novo.[2] "Summary

---

[2] *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 215 (5th Cir. 2024).

No. 23-30448

judgment is appropriate 'if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law.'"[3] "A genuine issue of material fact exists when the evidence is such that a reasonable jury could return a verdict for the non-moving party."[4] "When the party that did not move for summary judgment bears the burden of proof at trial—as [Howard] does on her negligence claim—the moving party need only point to a lack of evidence on an essential part of the non-moving party's claim."[5] "The burden shifts to the non-moving party to show, with competent evidence, the existence of a genuine dispute of material fact."[6] In such a situation, "[t]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim."[7] "All facts and reasonable inferences are construed in favor of the nonmovant, and the court should not weigh evidence or make credibility findings."[8] However, when a party's version of events "is blatantly contradicted by the record," including by video evidence, "so that no reasonable jury could believe it," we do "not adopt that version of the facts for purposes of ruling on a motion for summary judgment."[9] Rather, in such situations, we "view[] the facts in the light

---

[3] *Wapiti Energy, L.L.C. v. Clear Spring Prop. & Cas. Co.*, 106 F.4th 420, 423 (5th Cir. 2024) (quoting Fed. R. Civ. P. 56(a)).

[4] *Id.* (quoting *Austin v. Kroger Tex., L.P.*, 864 F.3d 326, 328 (5th Cir. 2017)).

[5] *Miller*, 98 F.4th at 216 (citing *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986)).

[6] *Id.* (citing *Celotex Corp.*, 477 U.S. at 322-23).

[7] *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004), *abrogated in part on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009)).

[8] *Wapiti Energy, L.L.C.*, 106 F.4th at 423 (citing *Deville v. Marcantel*, 567 F.3d 156, 163-64 (5th Cir. 2009)).

[9] *Scott v. Harris*, 550 U.S. 372, 380 (2007); *see also Agbonzee v. Wal-Mart Stores Tex., L.L.C. #772*, No. 21-20395, 2022 WL 3137428, at *2 (5th Cir. Aug. 5, 2022) (citing *Scott v.

No. 23-30448

depicted by the videotape."[10]

Under Louisiana law, a plaintiff bringing a slip-and-fall claim must prove,

> in addition to all other elements of his cause of action, all of the following:
>
> (1) The condition presented an unreasonable risk of harm to the claimant and that risk of harm was reasonably foreseeable.
>
> (2) The merchant either created or had actual or constructive notice of the condition which caused the damage, prior to the occurrence.
>
> (3) The merchant failed to exercise reasonable care. In determining reasonable care, the absence of a written or verbal uniform cleanup or safety procedure is insufficient, alone, to prove failure to exercise reasonable care.[11]

The plaintiff bears the burden of proof for each requirement of the statute, and satisfying each requirement is "mandatory" for the plaintiff to prevail on her claim.[12]

---

*Harris* in a slip-and-fall case involving security footage); *Romano v. Jazz Casino Co.*, No. 21-30554, 2022 WL 989480, at *2 (5th Cir. Apr. 1, 2022) (citing *Scott v. Harris* in a trip-and-fall case involving security footage); *McDowell v. Wal-Mart Stores, Inc.*, 811 F. App'x 881, 883 (5th Cir. 2020) (citing *Scott v. Harris* in a slip-and-fall case involving security footage); *Granados v. Wal-Mart Stores, Inc.*, 653 F. App'x 366, 369 (5th Cir. 2016) (same).

[10] *Scott*, 550 U.S. at 381.

[11] La. Rev. Stat. Ann. § 9.2800.6(B); *see Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 216 (5th Cir. 2024).

[12] *White v. Wal-Mart Stores, Inc.*, 97-0393, p.4 (La. 9/9/97), 699 So. 2d 1081, 1084 (footnote omitted) ("[I]n addition to all other elements of his cause of action, a claimant must also prove each of the enumerated requirements of Section (B). The conjunctive 'and' follows Section (B)(2). Thus, Sections (B)(1), (B)(2), and (B)(3) are all mandatory.").

No. 23-30448

Though Brookshire argued in its motion for summary judgment that Howard could not satisfy any of the three requirements of the Merchant Liability Act, the district court restricted its own decision and discussion to the second requirement: creation of, or constructive or actual notice of, the hazard.

Howard raises multiple arguments regarding the second statutory requirement in favor of reversing the district court's grant of summary judgment. First, she argues that there is a genuine issue of material fact regarding whether Brookshire created the hazard, either directly, through a failure to maintain its floors, or "by a general lack of slip resistance" in its floors. Second, she argues that there is a genuine issue of material fact as to whether Brookshire had actual or constructive notice of the hazard.

## A

There is no genuine issue of material fact as to whether Brookshire created the spill based on any theory that Howard puts forth. A plaintiff may satisfy the second element of the Merchant Liability Act by showing that the merchant "created . . . the condition which caused the damage, prior to the occurrence."[13] To establish creation of a hazard, the plaintiff must put forth "positive evidence" that the merchant created the hazard.[14] For a merchant to have created a hazard, the merchant must have been "directly responsible for the spill or other hazardous condition."[15] A plaintiff may show direct responsibility "in one of two ways—either via evidence that the defendant's

---

[13] La. Rev. Stat. Ann. § 9.2800.6(B)(2).

[14] *Duncan v. Wal-Mart La., L.L.C.*, 863 F.3d 406, 409 (5th Cir. 2017) (quoting *White*, 699 So. 2d at 1082).

[15] *Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 747 (5th Cir. 2017) (quoting *Ross v. Schwegmann Giant Super Mkts., Inc.*, 98-1036, p. 5 (La. App. 1 Cir. 5/14/99), 734 So. 2d 910, 913).

7

employees actually created the hazard (by, for example, spilling crab salad on the floor . . .) or evidence that the defendant was responsible for maintaining the area where the hazardous condition was manifest."[16]  "There is no requirement of notice when it comes to creation of the hazard."[17]

**1**

Howard argues that Brookshire created the spill through "the direct action of spilling the substance."  She bases that argument on the fact that one employee "was loading frozen food into the freezer next to the spill, and a second employee was loading food into the cooler directly over the spill" in the twenty minutes prior to Howard's fall.  In the course of that unloading, Howard theorizes, "Brookshire was negligent in causing the ice and water to spill on the aisle floor through improper packaging procedures, improper stocking procedures, as well as in failing to remediate the spill either through a lack of established or adequately enforced procedures for checking the floors for liquid spills."

Employee deposition testimony about the lack of ice in the nearby refrigerators and on the products that are stored in the freezers refutes this theory.  Multiple Brookshire employees testified that there is no ice in the fresh meat refrigerator next to the spill.  Multiple employees also testified that, in their experience, water and ice do not accumulate and fall off the products stored in those freezers.  The dissenting opinion disagrees, asserting that Harris "answered '[r]ight' when counsel asked if sometimes ice might fall off from frozen items 'like when you take a bag of chicken

_____

[16] *Id.* at 747-48.

[17] *Id.* at 748.

No. 23-30448

nuggets out of the freezer' even though a freezer might not contain actual ice."[18]  Below is the entire exchange cited by the dissenting opinion:

> Q: Yes, I do understand that.  Is there ice in any of these coolers?
>
> A: No.  No, ma'am.
>
> Q: Okay.
>
> A: This got—this—and then I'm saying this got ice, but it's like frozen stuff.
>
> Q: It's like when you take a bag of chicken nuggets out the freezer—
>
> A: Right.
>
> Q: —sometimes ice falls off of it.
>
> A: Right here (indicating).  It would be right here (indicating), but not in here (indicating).

Howard's counsel, not Harris, says that "sometimes ice falls off" frozen chicken nuggets when they are taken out of the freezer.  Harris does not agree to it.  She agrees to the statement "[i]t's like when you take a bag of chicken nuggets out the freezer" by interjecting "[r]ight."  But when counsel adds the possibility of ice falling off the frozen bag, Harris seems to switch to a new topic by stating, "[r]ight here" while indicating where something is on the exhibit in front of her.  The phrase "right here" is not synonymous with the phrase "right" or "correct" and does not indicate agreement with counsel's statement.  Harris also clarifies her intended meaning later, in a separate exchange:

> Q: And you told me earlier that that's where like frozen chicken nuggets would be.

---

[18] *Post* at 2.

9

No. 23-30448

A: Like, the bags of chicken nuggets.

Q: Like stuff for kids, right?  Back where the chicken nuggets are at?

A: Yeah.  Right.

Q: Okay.  And you told me earlier that sometimes when you pull those out because they're frozen, ice could fall off.

A: No, not from the freezer.

Q: Okay.

A: I mean, you know, I thought you were talking about the one in the middle, but like it be bags and stuff.  It don't be like icy.

Q: No.  I know.

A: But I don't think it would fall off.

Q: Okay.

A: You know.

In saying, "It don't be like icy" and "I don't think [ice] would fall off" the bag of chicken nuggets, Harris clarifies that she was not agreeing with the attorney's statement earlier in the deposition.  Though we view the facts in the light most favorable to the plaintiff, the lack of actual agreement earlier coupled with the later statement to the contrary means that a jury could not reasonably infer that Harris acknowledged that ice sometimes falls off the bags of chicken nuggets when people remove them from the freezer.  The uncontradicted testimony that ice and water do not fall off the frozen products, then, negates the possibility that the spill was due to ice and water falling off products during the process of unloading those products into the nearby freezers.

Furthermore, even though Harris testified that there is ice in the freezers in the vicinity of where Howard fell, video and photographic

10

evidence "blatantly contradict"[19] Howard's theory that the freezers or the boxes in which the frozen items sat prior to unloading could have been the source of the ice and water in which she slipped.  Aside from when Faulk initially rolled the dolly holding those boxes into the aisle, the video shows that the dolly remained at least two yards away from the spot where Howard fell and, for the most part, was farther from the spill than that.  The photos taken right after the spill do not show water extending in a path to the freezer or to any of the locations where the dolly holding the boxes of frozen products was previously positioned; the puddle is isolated on the floor.  To be sure, the puddle in the pictures is likely smaller than it was before Howard fell because her pants were wet after the fall, so she had soaked up some of the water.  However, she fell straight down on the aisle and her body was not directed toward the freezers and did not extend to the nearest prior location of the dolly, so she would not have soaked up all the water in a path from the freezers or the dolly to the puddle.  Moreover, the video shows that Dauphine did not wipe the floor anywhere within four feet of the freezers.  She also did not wipe down any spots where that dolly had sat before or while Faulk unloaded it; the closest she got was about two feet away from the nearest prior dolly location.  Dauphine testified that the spill "wasn't close to the freezer."  She also testified that "[t]here was nothing else" left after she cleaned, referring to a lack of other water on the ground, "because we looked around."  No evidence suggests that Dauphine did not clean up the entire spill or that the puddle ever extended to the freezer or to the spots where the dolly had sat.  Given the video and photographic evidence, a reasonable jury could not infer that the spill was caused by a leak from the freezers or from

_____

[19] *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

the boxes of frozen products on the dolly while the dolly sat in the aisle during Faulk's unloading.

The alternate possibility is that the ice and water dripped off the boxes containing products that Adams unloaded into the meat coolers across the aisle. As previously stated, that dolly sat over the spot where Howard later fell for approximately nine minutes in the period leading up to her fall. But Howard offers no evidence as to how boxes containing products soon-to-be-loaded into fresh meat coolers would deposit ice onto the ground. The dissenting opinion points out that some of the products sitting in the boxes may have been frozen, based on Harris's testimony that employees sometimes put frozen products into the meat coolers.[20] But neither Howard nor the dissenting opinion offer any reason why ice would fall off frozen products placed in the coolers when employees testified that ice does not fall off frozen products placed in the freezers. The dissenting opinion proffers that "common knowledge tells us that ice melts when removed from the freezer, and there is no dispute that there was a mixture of water and ice on the floor here as a result" and that "there is no 'scientific, technical or other specialized knowledge' necessary to establish that liquids freeze in a freezer but thaw upon removal."[21] Common knowledge cannot substitute for evidence to meet the plaintiff's burden on summary judgment to show a genuine dispute of material fact when there is direct evidence that ice and water do not fall off the items at issue. Howard did not offer evidence from a worker or a lay witness who had experience with these types of coolers or frozen products to aver that they do in fact have ice form or build up. Nor

_____

[20] *Post* at 3-4.

[21] *Post* at 3 & n.5.

did Howard offer expert testimony or opinion to that effect, though we agree with the dissenting opinion that expert opinion would not be necessary.

The dissenting opinion further observes that Adams "bent over as if to pick up something that fell or spilled at 7:46:37."[22] Indeed, the video shows Adams walking several steps across the aisle and stooping down, seemingly to pick something up from the ground a couple feet past the spot where Howard later fell, and then apparently depositing it on top of the boxes before resuming unloading. The dissenting opinion uses this moment to infer that Adams "appeared to drop or spill something" as part of determining that there is "a genuine dispute of material fact as to whether Brookshire created the hazard or was properly maintaining the floors under Louisiana law."[23] But the video does not show Adams dropping or spilling anything prior to picking up something up off the ground. Howard also did not cite this incident in her filings or hearing before the district court as raising a genuine dispute of material fact, and she did not refer to the moment to so argue in her briefing before our court, either. Based on her silence and the ambiguity in the video, we will not assume that a jury could reasonably infer from the act of picking up something unidentifiable that Adams dropped or spilled something that later caused Howard's fall.

The dissenting opinion further cites to Howard's testimony that "Natasha Palfrey, the store front-end manager, told her there had been issues with the 'meat guy' and 'they had talked to him before about putting wet floor signs down or something. She said, oh, he done did it again.'"[24] Howard did so testify. However, Howard later said that Palfrey did not

_____

[22] *Post* at 4.

[23] *Post* at 7.

[24] *Post* at 5.

specify that she knew of any such issues having happened that day, and the record contains no further details regarding which "meat guy" Palfrey was referring to, which part of the meat aisles he typically stocked, or any other information about his past issues. Moreover, Howard did not cite to, discuss, or rely on this testimony in her filings or hearing before the district court or in her briefing before our court. Once a moving party without the burden of proof at trial has met its burden on summary judgment, as Brookshire has done here, "[t]he nonmovant must identify specific evidence in the record and articulate the manner in which that evidence supports that party's claim."[25] Here, given Howard's silence and the ambiguity of this testimony, we decline to assume under these circumstances that a jury could reasonably infer from this testimony that Brookshire created the hazard.

There is no basis for inferring that there was ice in any of the boxes that the employees were unloading in the area prior to the spill or for inferring that ice must have formed in either the coolers or on products stored in them. Howard points to deposition testimony in which Harris agreed that one employee is responsible for "monitor[ing] the area in front of the freezer to see if there are any puddles and clean[ing] them up." Howard argues that "if ice never falls off of Brookshire's products," then there is no reason for "a Brookshire employee [to] be responsible for constantly monitoring the floor in that area." But this theory constitutes further speculation rather than the "positive evidence" that the standard for showing creation requires, and it also ignores the manifold other reasons why a grocery store would dedicate an employee to checking and cleaning its floors. We agree with the district court that Howard has not carried her burden of showing that there is a

---

[25] *Duffie v. United States*, 600 F.3d 362, 371 (5th Cir. 2010) (quoting *Johnson v. Deep E. Tex. Reg'l Narcotics Trafficking Task Force*, 379 F.3d 293, 301 (5th Cir. 2004), *abrogated in part on other grounds*, *Pearson v. Callahan*, 555 U.S. 223 (2009)).

genuine issue of material fact as to whether Brookshire actually created the spill.

**2**

There is also no genuine issue of material fact regarding whether Brookshire created the spill through its failure to maintain the floor properly. Howard argues that "a jury could reasonably conclude that the watery substance was on the floor well before the incident, and that Brookshire's failure to maintain the area led to the creation of the hazardous condition and is thereby directly responsible for [her] injuries." Howard supports this argument by analogizing to *Deshotel v. Wal-Mart Louisiana, L.L.C.*[26] Under *Deshotel*, a plaintiff may show a merchant's "direct responsibility" for creating a hazard through "evidence that the defendant was responsible for maintaining the area where the hazardous condition was manifest."[27] However, this showing requires the plaintiff to demonstrate the merchant's "failure to act—e.g., a failure to fix a *known* leaky roof, leading to the creation of hazardous puddles on the floor."[28] There was ample evidence in *Deshotel* that the merchant knew of the leaky roof. The defendant store admitted that its roof had leaks in "discrete locations"; the store manager's testimony "suggest[ed] the roof was leaking on the day of [the customer]'s injury"; "photographs in the record, purportedly from that day, show[ed] buckets and caution signs in various parts of the store"; the manager "testified that there were 'leaks throughout the building'"; the manager "suggested that the building was springing new leaks during [the] time [of the fall], stating that new leaks were a 'known issue' and that 'anybody in the

---

[26] 850 F.3d 742 (5th Cir. 2017).

[27] *Id.* at 747-48.

[28] *Id.* at 748 (emphasis added).

building . . . would be on the lookout for new leaks that had not been identified or marked' when it rained"; and the store billed a roofing contract for "roof recover" the month before the accident, though the store was not able to explain what that meant.[29]

We agree with the dissenting opinion that, like the merchant in *Deshotel*, Brookshire maintains its floors.[30]  But *Deshotel* requires more than merely showing maintenance; the plaintiff must also show that the defendant store knew of the hazard that caused the fall but failed to remedy it.  Here, the alleged analogous hazard would be potentially dripping boxes on carts.  Given that the court in *Deshotel* required that the store knew about the leaky roof but about not the puddle, Howard must show here that Brookshire knew that ice or water could potentially leak from the boxes of products to be loaded into the nearby freezers and coolers.  The only evidence of such knowledge of the potentially dripping boxes was Harris's testimony that there is ice in some of the freezers near the fall and that one employee is responsible for "monitor[ing] the area in front of the freezer to see if there are any puddles and clean[ing] them up."  As explained above, however, a jury could not reasonably infer that the ice in the freezers played a role in the spill because the spill was located too far away from the freezers and the boxes of products loaded into them.  The fact that an employee was responsible for monitoring the area in front of the freezers is not evidence that the freezers emitted ice or water on which Harris fell.  The video evidence is the relevant evidence in this regard.  The location of the fall and the area that Dauphine cleaned after the spill was at least four feet away from the freezers.  Even accepting that the employee's responsibilities to monitor show some

---

[29] *Id.* at 745-46.

[30] *See Post* at 6-8.

knowledge on Brookshire's behalf, a jury could not reasonably infer that the freezers or frozen boxes loaded into them caused the spill and subsequent fall at issue here. This evidence, then, fails to show knowledge of a relevant hazard in the way that the evidence presented in *Deshotel* did. Therefore, Howard cannot rely on Brookshire's maintenance of its floors to show it created the spill. [31]

**3**

Howard argues a jury "could reasonably find that Brookshire created the unreasonably dangerous condition by utilizing non-slip resistant flooring, or allowing wax buildup, in an area where frozen food products are sold." Howard bases this argument on her expert's conclusion that Brookshire's floors are "not slip-resistant whether dry or wet with water and [are] therefore unsafe for pedestrian traffic whether dry or wet with water." The expert further stated that "[p]ossible reasons for the lack of slip-resistance are excessive abrasive polishing or polishing with wax, but the actual reasons have not been established." He clarified in his deposition that he would not "offer an opinion as to why the floor may or may not be slip resistant," though "the nature of the floor, what was applied to the floor, how it was maintained . . . [were] all possibilities." Brookshire argues in response that this argument about a lack of slip-resistant flooring is forfeited because Howard did not raise it in her response opposing Brookshire's motion for summary judgment. "A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on

_____

[31] *See Bearb v. Wal-Mart La., Ltd. Liab. Corp.*, 534 F. App'x 264, 265 (5th Cir. 2013) (holding that the plaintiffs failed to show a genuine issue of material fact as to the second element of the Merchant Liability Act because they "offer[ed] only speculation and their own unsubstantiated statements to support their claims that: [the defendant store] created the condition").

appeal."[32]  Brookshire is correct that Howard's response to the motion for summary judgment did not reference slip-resistance as a cause of the fall and instead asserted that "she slipped on ice and water on the floor."

Even assuming the argument was not forfeited, it fails.  Howard cites *Savoie v. Southwest Louisiana Hospital Association*,[33] a Louisiana appellate case, to support this theory.  In *Savoie*, a visitor slipped in a hospital walkway and sued the hospital for having caused his injuries.[34]  The visitor presented expert testimony that given the "variety of cleaners, disinfectants, and restorers [that] are applied to the floor on a regular basis, the [hospital's] practice of stripping and waxing the floor every 12–18 months would not be timely to prevent the buildup of such materials to result in a flooring of non-uniform slip resistance."[35]  The court ruled that the visitor had "presented evidence sufficient to raise a genuine issue of material fact with regard to a possible wax buildup causing [the visitor] to fall."[36]  Since the hospital "maintain[ed] its own floors," the visitor was "not required to prove that it had notice or constructive notice of the possible buildup."[37]  The court held that "[i]f there was a buildup, [the hospital] created it," so the Merchant Liability Act's notice requirement did not apply.[38]

The expert testimony in *Savoie* showed that not only did the hospital render the floor slippery by failing to wax it regularly, but that it also was

---

[32] *Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021).

[33] 2003-982 (La. App. 3 Cir. 2/25/04), 866 So. 2d 1078.

[34] *Id.* at 1079.

[35] *Id.* at 1081.

[36] *Id.*

[37] *Id.*

[38] *Id.*

responsible for having applied the cleaners, disinfectants, and restorers in the first place. By contrast, Howard does not offer any facts analogous to the hospital's application of cleaners, disinfectants, and restorers. Indeed, her expert specifically admitted that he could not offer an explanation as to why the floors were not slip-resistant.

The non-precedential district court cases Howard cites are similarly distinguishable. In *Woodson v. Waffle House, Inc.*,[39] a customer sued a restaurant after slipping and falling "on a slippery substance on the floor."[40] The court determined that the customer had shown sufficient evidence of creation by arguing that the restaurant's "own mopping procedures created the dangerous condition" because the restaurants "own employees . . . mopped the floors."[41] Here, Howard offers no cause analogous to the mopping procedures in *Woodson* to explain how Brookshire created the spill. In *Rowland v. Outback Steakhouse of Florida, LLC*,[42] a customer also sued a restaurant after she slipped on the floor.[43] The customer's suit survived the restaurant's summary judgment motion in part because she offered expert testimony that "the slip events at the restaurant were likely caused by a built-up grease film on the floor surface, potentially combined with general dirt and leftover solution (detergent/chemical) used as part of the 'cleaning' process."[44] In the case before us, Howard's expert offered no cause of the lack of slip-resistance, so it is unknown if it was

---

[39] 640 F. Supp. 3d 603 (E.D. La. 2022).

[40] *Id.* at 604.

[41] *Id.* at 610-11.

[42] No. 22-0667, 2024 WL 220770 (W.D. La. Jan. 19, 2024).

[43] *Id.* at *1.

[44] *Id.* at *3-4.

created by Brookshire, unlike the built-up grease that the expert opined was created by the restaurant in *Rowland*. Because the facts of Howard's case differ substantially from the facts in these cases, her theory of slip-resistant flooring does not enable her case to survive summary judgment.

## B

There is also no genuine issue of material fact as to whether Brookshire had either actual or constructive notice of the spill. A plaintiff may satisfy the second element of the Merchant Liability Act by showing that the merchant "had actual or constructive notice of the condition which caused the damage, prior to the occurrence."[45]

## 1

Howard has two theories as to why Brookshire had actual notice of the spill: "(1) the spill was created during the unloading process . . . and, therefore, Brookshire had actual knowledge of the spill and (2) that Mr. Washington, the store director, had actual notice given that he walked through the spill and nearly slipped himself."

Howard's theory regarding the creation of the spill is not supported by any evidence, as explained above. Brookshire's alleged creation of the spill cannot support a theory that Brookshire had actual notice of the spill.

As to store director Washington's alleged actual notice of the spill, Washington testified that he did not see anything on the floor when he walked through the area two minutes before Howard fell. Howard's only response to this, presented for the first time on appeal, is that the surveillance video shows Washington "stutter step[ping]" as he walked over the spot where Howard later fell, so he must have had actual knowledge of the spill.

---

[45] La. Rev. Stat. Ann. § 9.2800.6(B)(2).

No. 23-30448

However, Howard did not raise this argument in the district court, nor did she ask Washington about this alleged stutter step during his deposition when her attorney reviewed the relevant portion of the video with him.  On those grounds, the argument is forfeited.[46]  Even if the argument were not forfeited, it would not create a genuine issue of material fact because the video does not, in fact, indicate that Washington slipped or "stutter stepped" as he walked through that area.  Howard has failed to raise a genuine issue of material fact as to whether Washington—and by extension his employer, Brookshire—had actual knowledge of the spill.

**2**

Lastly, there is no genuine issue of material fact regarding whether Brookshire had constructive notice of the spill.  Surviving a defendant's motion for summary judgment based on a constructive notice theory requires the non-moving plaintiff to create a genuine issue of material fact that "the condition existed for such a period of time that it would have been discovered if the merchant had exercised reasonable care."[47]  Louisiana courts call this "period-of-time requirement" "the temporal element."[48]  "[T]o prove the temporal element, a plaintiff 'must make a positive showing of the existence of the condition prior to the fall' as well as the 'additional showing that the condition existed for some time before the fall.'"[49]  "Importantly, on

---

[46] *See Rollins v. Home Depot USA, Inc.*, 8 F.4th 393, 397 (5th Cir. 2021) ("A party forfeits an argument by failing to raise it in the first instance in the district court—thus raising it for the first time on appeal.").

[47] *See* LA. REV. STAT. ANN. § 9.2800.6(C)(1).

[48] *Miller v. Michaels Stores, Inc.*, 98 F.4th 211, 216 (5th Cir. 2024) (citing *Fountain v. Wal-Mart Stores, Inc.*, 2019-669, p. 7 (La. App. 3 Cir. 3/18/20), 297 So. 3d 100, 106).

[49] *Id.* (quoting *White v. Wal-Mart Stores, Inc.*, 97-0393, p.4 (La. 9/9/97), 699 So. 2d 1081, 1084).

summary judgment, while [the plaintiff] must show the condition existed for some period of time before her fall, '[w]hether the period of time that a condition existed was sufficient to provide a merchant with constructive notice is a fact question that must be submitted to the jury.'"[50] However, "to survive summary judgment, a plaintiff must satisfy the 'prerequisite' of putting forth 'some positive evidence . . . of how long the condition existed prior to the fall.'"[51] "'[T]here is no bright line time period,' and 'the time period need not be specific in minutes or hours.'"[52] The temporal element "may be proven 'by both direct and circumstantial evidence.'"[53] Making a showing on the temporal element "is not an impossible burden,"[54] but "'[m]ere speculation or suggestion' is not sufficient to meet this burden, and courts will not infer constructive notice for the purposes of summary judgment where the plaintiff's allegations are 'no more likely than any other potential scenario.'"[55]

Howard argues that two pieces of evidence raise a genuine issue of material fact as to whether she satisfied the temporal element: the size of the puddle and the fact that the ice was melting when Howard slipped.

Evidence indicating that a puddle in which a customer slipped was large without further evidence of the puddle's source does not satisfy the

---

[50] *Flowers v. Wal-Mart Inc.*, 79 F.4th 449, 453 (5th Cir. 2023) (alteration in original) (quoting *Bagley v. Albertsons, Inc.*, 492 F.3d 328, 331 (5th Cir. 2007)).

[51] *Miller*, 98 F.4th at 216 (quoting *Bagley*, 492 F.3d at 331).

[52] *Flowers*, 79 F.4th at 453 (alteration in original) (quoting *White*, 699 So. 2d at 1084).

[53] *Id.* (quoting *Fountain*, 297 So. 3d at 106).

[54] *White*, 699 So. 2d at 1085.

[55] *Bagley*, 492 F.3d at 330 (quoting *Allen v. Wal-Mart Stores, Inc.*, 37,352, p. 5, 7 (La. App. 2d Cir. 6/25/03), 850 So. 2d 895, 898-99).

temporal element.[56]  In *Howard v. Family Dollar Store No. 5006*,[57] a Louisiana appellate court case, a customer sued a store after he "slipped on a puddle of blue liquid that had spilled on the aisle of the store."[58]  The liquid in question was "blue, coming from under a box stacked in the aisle, and 'all over the aisle.'"[59]  The trial court ruled in the customer's favor, but the appellate court reversed on the basis that the customer had not shown that the store had actual or constructive notice of the spill.[60]  Even though the customer "testified the puddle of liquid he slipped in was rather large, and he argue[d] this would suggest that it was on the floor for some period of time prior to him slipping in it," the court "decline[d] in the absence of additional evidence concerning the origin and mechanics of the spill to infer a correlation between the size of the spill and the length of time the spill existed prior to the incident."[61]  Consequently, the court reversed the trial court's judgment and rendered judgment for the store.[62]

By contrast, a spill covering a significant area, coupled with additional evidence that suggests at least some time passed after the spill occurred, raises a genuine issue of material fact such that the plaintiff can survive summary judgment on the temporal element.[63]  In *Bagley v. Albertsons, Inc.*,[64]

---

[56] *Howard v. Family Dollar Store No. 5006*, 40,282, p. 7 (La. App. 2d Cir. 10/26/05), 914 So. 2d 118, 122.

[57] 40,282 (La. App. 2d Cir. 10/26/05), 914 So. 2d 118.

[58] *Id.* at 119.

[59] *Id.*

[60] *Id.* at 121-22.

[61] *Id.* at 122.

[62] *Id.*

[63] *Bagley v. Albertsons, Inc.*, 492 F.3d 328, 331 (5th Cir. 2007).

[64] 492 F.3d 328 (5th Cir. 2007).

a customer, alone in a grocery store aisle, "slipped and fell on a liquid substance," and when a fireman came to help her, "he also fell while approaching her and later observed a trail of the substance down the aisle and into an adjacent aisle."[65] Regarding constructive notice, we reasoned that the fireman's testimony "that the spill covered a significant area extending through the aisle and into an adjoining back aisle" supported "a reasonable inference that the liquid leaked from a customer's cart" even though such an inference was not sufficient to support an argument that the store had created the spill.[66] "[B]ecause the size and nature of the spill demonstrate[d] that some period of time passed before [the customer's] accident," we reversed the district court's grant of summary judgment against the customer.[67]

Howard's case is like *Family Dollar Store* because the allegedly large size of the puddle is her only evidence supporting the theory that some time had passed since the spill occurred. The customer in *Family Dollar Store* testified that the puddle in which he slipped was "rather large"[68] and that it was "all over the aisle."[69] Similarly, the ninety seconds that Brookshire employee Dauphine spent cleaning up the spill and the broad portion of the right side of the aisle that she wiped down while doing so arguably suggest that the spill covered a wide area, even though the picture of the spill suggests otherwise. Viewing the evidence in the light most favorable to Howard, as we must, the conflict between these two pieces of evidence at least raises a genuine issue of material fact that the spill may have covered a wide area. But

---

[65] *Id.* at 329-30.

[66] *Id.* at 331.

[67] *Id.*

[68] *Howard v. Family Dollar Store No. 5006*, 40,282, p. 7 (La. App. 2d Cir. 10/26/05), 914 So. 2d 118, 122.

[69] *Id.* at 119.

No. 23-30448

the court in *Family Dollar Store* deemed the size of the puddle insufficient to infer that time had passed since the spill "in the absence of additional evidence concerning the origins and mechanics of the spill."[70]  Here, too, Howard offers no explanation of the source or mechanics of the puddle in which she slipped that a reasonable jury could believe.

Howard's case is not like *Bagley* because she has provided no evidence of the nature of the puddle that supports a finding that some period of time passed after the spill and before her fall.  In *Bagley*, the spill extended from one aisle into the next as if created by liquid that had leaked from another customer's cart.  That fact—coupled with the fact that no other carts were in the aisle at the same time as the plaintiff-customer—assured the court that some time had passed between the leaking of the liquid and the plaintiff-customer's fall.  Howard has offered no analogous evidence.

Howard points to the melted state of the ice in which she slipped.  Evidence that the substance in which a customer slipped was "in the process of melting" supports an inference that the substance had been on the ground for at least some period of time.[71]  However, the Louisiana appellate court in that context was describing a substance that appeared "to be either ice cream or pie filling."[72]  Ice, on the other hand, could have already been in a partially melted state when it first got to the floor, so the fact that it was melting when Howard fell is not sufficient evidence to satisfy the temporal element.

The dissenting opinion would infer that if Brookshire did not create the spill itself, "that would mean the spill had been on the floor in excess of

_____

[70] *Id.* at 122.

[71] *Henry v. Wal-Mart Stores, Inc.*, 99-1630, p. 3-4 (La. App. 3 Cir. 3/1/00), 758 So. 2d 327, 329.

[72] *See id.* at 328.

25

an hour, and numerous employees walked right over it and did nothing."[73] The dissenting opinion bases this inference on the "video starting an hour before the fall" and the fact that "nothing other than the unloading of the dollies occurred in the area of the fall during that time period."[74] But together, these facts add up to "[m]ere speculation or suggestion" regarding the timing of the accident that "is not sufficient to meet [the plaintiff's] burden" on summary judgment.[75] Additionally, given that the video shows more than twenty people walking without apparent incident through the area in which Howard later fell in the hour leading up to the fall, we disagree that a jury could reasonably infer that the spill had been there for such a length of time.

Because Howard has failed to offer positive evidence showing that the puddle existed for some period of time before her fall, she has failed to raise a genuine issue of material fact as to whether Brookshire had constructive notice of the puddle.

*    *    *

We AFFIRM the judgment of the district court.

---

[73] *Post* at 8.

[74] *Post* at 8.

[75] *Bagley v. Albertsons, Inc.*, 492 F.3d 328, 330 (5th Cir. 2007) (quoting *Allen v. Wal-Mart Stores, Inc.*, 37,352, p. 5, 7 (La. App. 2d Cir. 6/25/03), 850 So. 2d 895, 898-99).

No. 23-30448

James E. Graves, Jr., *Circuit Judge*, dissenting.

I disagree with the majority's conclusion that Howard failed to establish a genuine issue of material fact regarding the creation of the hazard. Because I would vacate the district court's grant of summary judgment and remand, I respectfully dissent.

The majority sets out what Howard must do to establish creation of a hazard under Louisiana's Merchant Liability Act. It says that this can be done 1) either via evidence that the defendant was directly responsible for the spill or hazard, or 2) by evidence that the defendant was responsible for maintaining the area where the hazardous condition was manifest. *See* La. Rev. Stat. Ann. § 9.2800.6(B); *see also Deshotel v. Wal-Mart La., L.L.C.*, 850 F.3d 742, 747 (5th Cir. 2017), as discussed more fully herein. The majority also acknowledges the following: "There is no requirement of notice when it comes to creation of the hazard." *Id.* at 748.

The majority addresses the "direct action of spilling the substance" by discussing at length its conclusions about the lack of ice in the refrigerators and freezers. But employee Edith Harris testified that there was ice in the freezers. Harris also testified that items were stocked in the freezers just before Howard's fall, and that frozen items were sometimes placed in the refrigerated coolers. Specifically, Harris said: "But these here (indicating), you can see it's ice because it be hard frozen."; "Yeah. They all hold meat, but it's nothing – like, right here (indicating) – okay – would be the frozen turkey – the frozen turkey part. Now, this would have ice in it."; "This got – this – and then I'm saying this got ice, but it's like frozen stuff." Harris made specific reference to numerous frozen items, including chicken nuggets, breakfast sandwiches, shrimp, seafood, smoked meat, rice dressing, crab claws etc. Additionally, Harris confirmed that there was an employee

27

who would regularly inspect the floor near the freezer containing chicken nuggets to make sure no ice had fallen out and there were no puddles.

Harris also said that, just before Howard's fall, some items were loaded in the freezers that contained bags of "chicken nuggets and all kind of frozen stuff." Harris answered "[r]ight" when counsel asked if sometimes ice might fall off from frozen items "like when you take a bag of chicken nuggets out of the freezer" even though a freezer might not contain actual ice. The majority asserts that "Harris does not agree to it." Instead, the majority argues that Harris was only agreeing to the first part of the question that "[i]t's like when you take a bag of chicken nuggets out of the freezer." But that interpretation is belied by the very answer Harris gave. That entire portion of the exchange was about ice. Harris was recounting all of the places where ice would be. Harris also clearly understood the question. The fact that she began answering before counsel finished the entire sentence in no way establishes that she was only agreeing to part of the question but expressly disagreeing with the other part. Harris' follow-up answer makes it even more clear when she indicated exactly where such frozen items and ice would be located: "Right here (indicating). It would be right here (indicating), but not in here (indicating)."[1]

The majority also asserts that its interpretation is supported by a subsequent statement that Harris made that the majority says was intended to clarify what she meant. As quoted by the majority, Harris first said "I thought you were talking about the one in the middle, but like it be bags and stuff. It don't be like icy." The majority relies on that statement and a

---

[1] The majority asserts that "[t]he phrase 'right here' is not synonymous with the phrase 'right' or "correct' and does not indicate agreement with counsel's statement." But nobody makes the argument that "right here" is synonymous with "right," which the majority concedes that Harris explicitly said.

subsequent statement wherein Harris said, "[b]ut I don't think it would fall off," to conclude that "Harris clarifies that she was not agreeing with the attorney's statement earlier in the deposition." However, I disagree that these subsequent statements clarify that Harris disagreed with a portion of the earlier question. Instead, this testimony definitively establishes that there indeed were frozen items, particularly "bags and stuff" like chicken nuggets and shrimp, in the "one in the middle," as well as along the sides. Further, while Harris said the cooler itself did not contain ice, she confirmed that there would be ice on those frozen items by saying "[b]ut I don't think it would fall off." She did not say there is no ice, or it could not fall off, just that she did not think it would fall off. Yet science and common knowledge tell us that ice melts when removed from the freezer, and there is no dispute that there was a mixture of water and ice on the floor here as a result.[2] Harris also testified that the carts were simply parked in the cooler between uses.

That brings us to the store video, which the majority argues "blatantly contradict[s]" any "theory that the freezers or the boxes in which the frozen items sat prior to unloading could have been the source of the ice and water in which she slipped." I disagree for the reasons stated herein and based on the attached store video, the deposition testimony, and the applicable law.[3] The majority also offers various measurements that appear to be solely based

––––––––––––––––––––––––––––––

[2] The majority takes issue with the use of "common knowledge," arguing that it cannot substitute for evidence. But it is not used to substitute for evidence; it is used to illustrate that portions of the testimony and the video are consistent with common knowledge and, thus, a reasonable explanation. Further, regarding the majority's reference to Howard not offering expert testimony, there is no "scientific, technical or other specialized knowledge" necessary to establish that liquids freeze in a freezer but thaw upon removal. Fed. R. Evid. 701(c), 702(a). Thus, there is no requirement that Howard also needed an expert witness.

[3] https://www.ca5.uscourts.gov/opinions/unpub/23/23-30448-Exhibit_C.mp4

on its observations of the video, its characterization of the direction and location of Howard's fall, and its analysis of the wiping of the spill. I likewise disagree.

The video establishes that shortly before Howard fell, employees had been unloading boxes on dollies at both ends of the relevant section of freezers and coolers where Howard fell. *See* 7:15:38, 7:40:48, 7:41:09, 7:59:58. Two different dollies, which contained boxes of frozen and chilled items, were pushed directly over the area where Howard fell. *See* 7:40:48, 7:41:09. Harris testified that frozen items were also placed in the open, fresh coolers. One of the dollies loaded with boxes was parked for several minutes directly over the area where Howard fell. Additionally, the employee unloading that dolly bent over as if to pick up something that fell or spilled at 7:46:37. We also know that all of this occurred shortly before Howard fell at 7:59:58.

The majority disregards this evidence because "the video does not show [the employee] dropping or spilling anything prior to picking up something off the ground. Howard also did not cite this incident . . . . Based on her silence and the ambiguity in the video, we will not assume that a jury could reasonably infer from the act of picking up something unidentifiable that [the employee] dropped or spilled something that later caused Howard's fall." But the majority's position on this contradicts it's reliance on *Scott v. Harris*, 550 U.S. 372, 380 (2007), for the proposition that we "view the facts in the light depicted by the videotape." There is clearly a question of fact as to what the employee was picking up and whether it contributed to Howard's fall.

Other employees also testified that an employee was stocking frozen items just before and adjacent to where Howard fell. Employee Edna Ann Dauphine testified that Dale Faulk, who had a dolly full of boxes, had the freezer doors open and was stocking frozen items as shown on the video at

7:41:59. Referencing the video at 7:42:50, counsel asked Dauphine the following: "The freezer that he's loading stock into – now, do you see where he walks to the freezer that was adjacent or next to where my client fell; do you agree with that?" Dauphine answered, "[y]es." As the video advanced, Dauphine confirmed that Faulk continued loading stock into the freezer. Employee Jonathan Faulk ("Jonathan") also testified that Howard fell between the open cooler and the freezer section. Jonathan also confirmed that his cousin, Dale, had been loading items into that section of freezers just before Howard fell. Employee Lisa Dalati also confirmed that frozen items were being loaded into the freezers in the area where Howard fell. Lester Washington, the store director, likewise confirmed that Howard fell in the area between the frozen and fresh meat, and that an employee was loading the adjacent freezers. Howard also testified that Natasha Palfrey, the store front-end manager, told her there had been issues with the "meat guy" and "they had talked to him before about putting wet floor signs down or something. She said, oh, he done did it again."

The majority disregards any evidence to the contrary and concludes that there is no genuine issue of material fact as to whether Brookshire created the spill, or whether Brookshire failed to properly maintain the floor. The majority quotes *Deshotel* as requiring Howard to demonstrate Brookshire's "failure to act—e.g., a failure to fix a *known* leaky roof, leading to the creation of hazardous puddles on the floor." *Id.*, 850 F.3d at 748 (emphasis added by majority). The majority states that "Howard must show here that Brookshire knew that ice or water could potentially leak from the boxes of products to be loaded into the nearby freezers and coolers." But Howard does show that Brookshire knew that there was a problem with such leaks because there was an employee assigned to monitor that particular area and clean them up.

The majority dismisses this evidence based on it having weighed the evidence and determined that "a jury could not reasonably infer that the ice in the freezers played a role in the spill because the spill was located too far away from the freezers and the boxes of products loaded into them to reasonably infer a connection between them." But the law does not allow us to weigh the evidence or make credibility findings at the summary judgment stage. *See Seigler v. Wal-Mart Stores Texas, L.L.C.*, 30 F.4th 472, 476 (5th Cir. 2022). Instead, "all facts and reasonable inferences are construed in favor of the nonmovant." *Id.*; *see also Deshotel*, 850 F.3d at 745.

To reiterate *Deshotel*, "[w]hen a defendant maintains its own floors, the plaintiffs are not required to prove that it had notice or constructive notice of the possible hazard. If there is a hazard, defendant created it, thus, the notice requirement of La. R.S. 9:2800.6 does not apply...." 850 F.3d 747 (internal marks and citation omitted). We have evidence that Brookshire was responsible for maintaining its own floors, and the majority cites no evidence to the contrary. We have video showing that two dollies loaded with boxes of fresh and frozen items were pushed over the area where Howard fell shortly before she fell, that frozen items were being unloaded in the area of Howard's fall, that one of the dollies was parked directly over the area for a period of time prior to Howard's fall, that the employee unloading that dolly also appeared to drop or spill something, and that there indeed was a spill. We also have testimony from an employee that there was ice in multiple freezers adjacent to the area of the fall, that frozen items were also placed in the refrigerated coolers at times, that there can be ice on packages of frozen items, and that the particular area where Howard fell was supposed to be monitored for spills. Howard also testified that a manager had told her about a potential issue with the "meat guy." Taken together, those things sufficiently establish that there is at the very least a genuine dispute of material fact as to whether Brookshire created the hazard or was properly

32

maintaining the floors under Louisiana law. *See Deshotel*, 850 F.3d at 747; *see also* Fed. R. Civ. P. 56(a); La. Rev. Stat. Ann. § 9.2800.6(B)(2).

Notwithstanding that the notice requirement does not apply, the majority's further assertion that Howard failed to establish constructive notice likewise fails. Relying on *Duncan v. Wal-Mart, L.L.C.* and similar cases, the majority maintains that Howard failed to offer the "positive evidence" required by the standard for showing creation. 863 F.3d 406, 409-10 (5th Cir. 2017).

Duncan, a Wal-Mart employee, slipped and fell in front of a Reddy Ice freezer at work and was injured. *Duncan*, 863 F.3d at 409. The issue was whether Wal-Mart had created or had actual or constructive notice of water under a mat in front of the Reddy Ice freezer. *Id.* at 409. While there was no discussion of *Deshotel* or whether Wal-Mart was responsible for maintaining its own floors, this court said that Duncan "must come forward with positive evidence showing that the damage-causing condition existed for some period of time, and that such time was sufficient to place the merchant defendant on notice of its existence." *Id.* (quoting *White v. Wal-Mart Stores, Inc.*, 97-0393, P.1 (La. 9/9/97), 699 So.2d 1081, 1082) (emphasis removed). This court went on to discuss how Duncan repeatedly explained that she had no idea how the water got under the mat, and that in the four years she had worked there she had never heard of the ice machine leaking. *Id.* at 410. Further, Duncan admitted that she had "*no evidence* to explain how the water came to be under the mat nor how long it had been there before her fall." *Id.* (emphasis original).

Here, we have testimony, video, and an area that is supposed to be monitored continuously because it is known for spills. Howard maintains the icy water came from the unloading of frozen items over the area. The majority disputes that anything frozen being loaded into the adjacent freezers

would have had condensation or ice crystals, makes factual findings that the only ice would have been located too far away, and disregards any evidence to the contrary. Assuming arguendo that the majority was correct, then that would mean the spill had been on the floor in excess of an hour, and numerous employees walked right over it and did nothing.[4] We know this because we have video starting an hour before the fall and nothing other than the unloading of the dollies occurred in the area of the fall during that time period. Further, as Howard asserts, there was no other person in the area between the time Washington walked through and the time Howard fell in the ice water. Based on that time period and the fact that numerous employees, including Washington, would have walked right over it and unreasonably did nothing, Howard would be able to establish constructive notice under *Duncan*. 863 F.3d at 409-410.

At the summary judgment stage, we only determine whether a reasonable jury could believe Howard's account. Howard has alleged enough evidence to establish the existence of a genuine issue of material fact regarding whether Brookshire created the hazard. Thus, the district court erred in granting summary judgment. Because I would vacate and remand, I respectfully dissent.

---

[4] Interestingly, there are large, yellow, absorbent socks, which are used for leaks, visible on the video in front of a few different freezers/coolers. At the 8:05:33 mark of the video, which was shortly after Howard fell, an employee appeared to accidentally kick one of the socks and knocked it partially into the aisle. The employee looked down but did not attempt to fix it and walked away. Multiple other people who also appeared to be employees then walked past the sock but did not fix it.